## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| Katie Roberts, *pro se* | |
| Rosemary Walker, *pro se* | |
| Thad Snider, *pro se* | |
| Stacie Harvey, *pro se* | |
| Hannah Mingucci, *pro se* | Civil Case NO.   2:22-cv-2366-JWB-ADM |
| Melissa Leavitt, *pro se* | |
| Petitioners, | _____ |
| | |
| Vs. | |
| | |
| BRYAN CASKEY, in his official capacity of | |
| Director of Elections, Office of the Kansas | |
| Secretary of State, SCOTT SCHWAB, in his | **VERIFIED PETITION FOR WRIT OF** |
| official capacity of Kansas Secretary of State, | **MANDAMUS** |
| DEREK SCHMIDT, in his official capacity as | **(Election Matter)** |
| Attorney General of the State of Kansas, and | **(TRO Requested)** |
| LAURA KELLY, in her official capacity as | |
| Governor of the State of Kansas | |
| | |
| Respondents, | |

## VERIFIED PETITION FOR WRIT OF MANDAMUS

**COMES NOW** *Pro se* Petitioners, Katie Roberts, Rosemary Walker, Thad Snider, Stacie

Harvey, Hannah Mingucci and Melissa Leavitt, (hereinafter referred to as "Petitioners") pursuant

to Kansas Gov't Code § 25-4183 and § 60-901, herby file this Verified Petition for Writ of

Mandamus and emergency injunction to respectfully request the Honorable court to order

Respondents, Bryan Caskey, Scott Schwab, Derek Schmidt, and Laura Kelly, to properly fulfill their official duties to uphold the election laws and correct an abuse of discretion. Additionally, due to the time sensitivity of the upcoming general election on November 8, 2022, the Petitioners respectfully request the Honorable court to hear this case in a timely manner and place an emergency injunction on **all county elections across Kansas** to ***remove the use of electronic voting machines*** (except one machine per polling location available for those with disabilities) and administer an all paper ballot election. The Petitioners have researched or have first-hand knowledge of overwhelming evidence that electronic voting systems are ***NOT*** safe and secure, which undermines the voter's intent, therefore violating fundamental voting rights according to the fourteenth amendment of the U.S. Constitution. Additionally, the Petitioners believe the Respondents certified an illegal election in 2020, 2021 and 2022 and ask the court to demand the Kansas Board of Canvassers, consisting of the Respondents Scott Schwab, Derek Schmidt and Laura Kelly, to rectify. Elections have consequences, therefore election officials should ***never*** value efficiency over accuracy and no amount of maladministration should be tolerated or accepted.

## TABLE OF CONTENTS

JURISDICTION AND VENUE ................................................................................................... 3
PARTIES ..................................................................................................................................... 6
GENERAL ALLEGATIONS ...................................................................................................... 8
ATTEMPTS AT MITIGATION ............................................................................................... 11
STATEMENT OF FACTS ........................................................................................................ 13
UNCERTIFIED ELECTRONIC VOTING SYSTEMS, VIOLATION OF THE KANSAS
ELECTION LAWS & HAVA ACT ......................................................................................... 16
    *The 2020 Presidential Election was Unlawfully Certified* ................................................ 16
    *The 2020 Presidential Election Equipment Non-Compliance* ........................................... 20
    *Pro V&V Accreditation Lapsed Resulting in Illegally Certified & Used Machines* ............ 24
    *VSTL's Not Compliant with EAC Testing Standards* ......................................................... 33
    *HAVA Act Maximum Acceptable Error Rate* ..................................................................... 42
    *Impact of violation of HAVA* ............................................................................................. 45

JUSTIFICATION FOR EMERGENCY INJUNCTION - VOTING MACHINES ...................46
   *Modems in Electronic Voting Systems* ................................................................. 47
   *Kansas and Ohio Elections in 2020 mimic each other - not naturally probable* .................50
   *Malware Attack - Ballot Image Manipulation* ...................................................... 52
   *Fraud Built On "Plausible Deniability" & "Human Error"* ................................ 53
   *Thumb Drives - Flip or Maladminister Votes* ...................................................... 55
   *Foreign Entities In Our Elections - Whistle blower Affidavit (Exhibit Q)* ............................56
   *Electronic Voting Machines Can be Hacked - IT Elections Security Expert Testimony* ...... 59
   *Votes Can Be Fractionalized* .............................................................................61
VIOLATIONS ............................................................................................................61
   *25-4603. Certification by the Secretary of State* ................................................. 61
   *K.S.A. 25-3009. Post Election Audit Violations  - Affidavit by Thad Snider (Exhibit A)* ......62
   *K.S.A. 25-4406(m). Voting Equipment fails to meet HAVA* .................................. 63
   *K.S.A. 25-4414. Electronic Voting Machines Purchased Are Illegal* .................................. 64
   *K.S.A. 25-1122(g). Allowing the use of Illegal Drop Box sites* .................................65
PLAINTIFF(S) FACE DIFFICULT CIRCUMSTANCES .......................................................69
DOCUMENTARY EVIDENCE ....................................................................................72
VERIFIED PETITION OF MANDAMUS ..................................................................73

## JURISDICTION AND VENUE

1. This verified petition is for a writ of mandamus. Jurisdiction[1] is proper in this Court pursuant to K.S.A. § 25-3206 et al. The duty to certify the Kansas 2020 presidential election results is a ministerial duty to which the statute specifically describes the manner of performance. The Respondents must certify a lawful election and they may not certify an illegal/unlawful election.

2. This Court has subject matter jurisdiction over the Plaintiffs' claims under the ***Help America Vote Act 2002 (HAVA ACT)***, and Title 18 U.S.C. 242, and ***Title 28 U.S.C. § 1331***, ***§ 1343(a)(3), (4), §1367, §2201,*** and § 1391(a)(1), (b)(2), and ***Title 42 U.S.C. § 1983,*** and Title 52 U.S.C. § 10307(d), § 20511(2)(B) and ***U.S. Constitution 10th and 14th Amendment***.

   a. "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

---

[1] The 2020 presidential election is/was a statewide election. The writ seeks to compel state officials to discharge a duty owed by state law. The District Court of Kansas is a statewide court. It only stands to reason that a state branch of government should be the proper entity to compel a co-equal state branch of government to discharge a duty owed by a state statute. This Court has jurisdiction and jurisdiction is proper.

3.  There exists an actual and justiciable controversy between Petitioners and Respondents requiring resolution by this Court. Venue is proper before the United States District Court for the Tenth District of Kansas under *28 U.S.C §1391* because all parties reside or otherwise are found herein, and all acts and omissions giving rise to Plaintiffs' claims occurred in the Tenth District of Kansas.

Under the *U.S. Constitution 1ˢᵗ Amendment*. Freedoms concerning religion, expression, assembly, and the right to petition;

> *"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."*

4.  Plaintiffs have standing under the *Kansas Constitution, Bill of Rights, § 3*. Right of peaceable assembly; petition.

> *"The people have the right to assemble, in a peaceable manner, to consult for their common good, to instruct their representatives, and to petition the government, or any department thereof, for the redress of grievances."*

5.  Plaintiffs have standing under *Elmore v. McCammon* (1986) 640 F. Supp. 905 "…. the right to file a lawsuit pro-se is one of the most important rights under the constitution and laws."

6.  The Petitioners have suffered "injury in fact" as protected interest was actual or imminent, concrete and particularized.

    a.  Petitioner, Thad Snider, believes he was a witness to an illegally conducted post election audit process for the 2022 primary election that was certified by the Kansas Board of Canvassers, despite being made aware of the violation. Thad was an unwilling participant to an illegal post election audit. Thad, is an unwilling party of violation of their Oath of Office to uphold the U.S. Constitution and the Kansas Constitution (**Exhibit A**).

b. KORA requests made by Petitioner, Stacie Harvey for Cast Vote Records were denied by Sedgewick County election officials (**Exhibit B),** the plaintiff suffers an 'injury-in-fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to statute." *Federal Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998) (citing *Public Citizen v. Department of Justice*, 491 U.S. 440, 449 (1989).

c. Petitioners have a constitutional right to participate in a presidential election under the 26th Amendment to the U.S. Constitution. The 14th Amendment to the U.S. Constitution protects the Petitioners right to vote.

    i. Petitioners suffered actual injury in fact during the 2022 Primary Election when a hand recount of the Value Them Both Amendment uncovered errors in the Petitioners districts.  Petitioners represent Johnson County, Shawnee County and Sedgewick County, all of which had more errors than are allowed by law.

    ii. Petitioners suffer an imminent injury in fact of their right to vote if they are required to vote in a compromised election process. The election process was shown to be compromised in the Value them Both Recount. This harm is shared by all Kansas voters who vote on uncertified election equipment, "[I]t does not matter how many [other] persons have [also] been injured…. [W]here a harm is concrete, though widely shared, the Court has found injury in fact." *Massachusetts v. Environmental Protection Agency*, 549 U.S. 497, 517, 522 (2007).

7. Injury can fairly be traced to the challenged action of the Respondents. The statements of fact and arguments of this petition will show that the Respondents failed to meet required legally established laws to ensure a free and fair election (*since the burden of proof falls on the State,*

*the Respondents must prove false claims in this petition and cannot dismiss them simply because they do not agree*). These actions of the Respondents have resulted in injuring the Petitioners. Their actions resulted in:

    a. Violations of Kansas and U.S. election laws during the 2020 General election and the 2022 Primary election.

    b. An imminent compromise of the 2022 General Election.

8. And given that an unconstitutional act is at issue, "one does not have to await the consummation of threatened injury to obtain preventive relief." *NRO of Am. V. Magaw*, 132 F.3d 272, 286 (6th Cir. 1997). See c.f., *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141S. Ct. 63, 68 (2020) (recognizing that "in a pandemic, the Constitution cannot be put away and forgotten."). All that is necessary is that there is a "reasonable expectation" that a constitutionally offensive policy will be enforced. See *Honig v. Doe*, 484 U.S. 305,319-20 (1988).

9. Without an emergency injunction to remove all electronic voting machines for the November 8 elections, the elections will continue to be insecure, unfair, and lack transparency by election clerks and election commissioners.

10. This is an action for declaratory and injunctive relief authorized by *K.S.A. 60-1701, 60-1703* (declaratory relief) and *K.S.A. 60-901, 60-902* (injunctive relief). Injury is likely to be redressed by a favorable decision and Petitioners are likely to prevail on the merits of this case.

## PARTIES

11. Petitioner, Katie Roberts, is a Kansas resident who voted in Kansas' statewide 2020 presidential election and all elections since.

12. Petitioner, Rosemary Walker, is a Kansas resident who voted in Kansas' statewide 2020 presidential Election and all elections since.

13. Petitioner, Thad Snider, is a Kansas resident who voted in Kansas' statewide 2020 presidential election and all elections since.

14. Petitioner, Stacie Harvey, is a Kansas resident who voted in Kansas' statewide 2020 presidential election and all elections since.

15. Petitioner, Hannah Mingucci, is a Kansas resident who voted in Kansas' statewide 2020 presidential election and all elections since.

16. Petitioner, Melissa Leavitt, is a Kansas resident who voted in Kansas' statewide 2020 presidential election and all elections since.

17. Petitioners are citizens of The United States of America and they are over the age of eighteen (18).

18. Petitioners have a constitutional right to participate in all elections. See *U.S. Constitution Amendment 26*.

19. Petitioners suffered a distinct and palpable injury when the State of Kansas conducted an unlawful presidential election on November 3, 2020.

20. On November 30, 2020[2], Respondent SCOTT SCHWAB was the Secretary of State and he unlawfully certified the 2020 presidential election.

21. On November 30, 2020, Respondent LAURA KELLY was the Governor of Kansas and she unlawfully certified the 2020 presidential election.

22. On November 30, 2020, Respondent DEREK SCHMIDT was the Kansas Attorney General and he unlawfully certified the 2020 presidential election.

---

[2]http://www.kslegislature.org/li/b2021_22/committees/ctte_s_transparency_and_ethics_1/documents/testimony/20210113_03.pdf

23. Respondent BRYAN CASKEY, is the State Election Director for Kansas, appointed by the Secretary of State, has a duty to ensure the electronic voting machines in Kansas are properly certified by accredited testing labs. The electronic voting machines in Kansas were not properly certified by accredited testing labs for the 2020 presidential election. Bryan Caskey has sworn an oath to uphold and defend the Constitution of the United States of America and the Constitution of the State of Kansas.  See Art. 15, § 14 of the Kansas Constitution.

24. Respondent, SCOTT SCHWAB, is the duly elected, qualified, and acting Secretary of State for the State of Kansas and is the Chief Election Commissioner for Kansas.  Scott Schwab has sworn an oath to uphold and defend the Constitution of the United States of America and the Constitution of the State of Kansas.  *See* Art. 15, § 14 of the Kansas Constitution. President and Member of the National Association of Secretaries of State (NASS) with a secret security clearance.

25. Respondent, DEREK SCHMIDT, is the duly elected, qualified, and acting Attorney General of the State of Kansas.  Derek Schmidt has sworn an oath to uphold and defend the Constitution of the United States of America and the Constitution of the State of Kansas.  See Art. 15, § 14 of the Kansas Constitution.

26. Respondent, LAURA KELLY, is the duly elected, qualified, and acting Governor of the State of Kansas.  Laura Kelly has sworn an oath to uphold and defend the Constitution of the United States of America and the Constitution of the State of Kansas.  See Art. 15, § 14 of the Kansas Constitution.

**GENERAL ALLEGATIONS**

Petitioners bring this complaint to correct the wrong doings in the 2020 presidential election and to preserve the integrity of Kansas elections forthcoming. As the United States and

Kansas Constitution protects our first amendment rights, including the right to petition the government to seek resolution for grievances (*KS Constitution § 4)*. Petitioners have attempted to receive justice in the matter of the 2020 presidential election. **Petitioners and others,** The People of the sovereign State of Kansas have addressed both houses of the Kansas State Legislatures, the Voting Systems Commission, the Commissioner of Elections, Clerks of Courts, Registrars of Voters, parish election commissioners, Attorney General Derek Schmidt and the Kansas Secretary of State Office and have found no relief.  Petitioners have also addressed their county level District Attorney, election officials, commissioner and canvassers. The Petitioners have been forced to utilize the same uncertified voting machines during the 2022 primary election, despite the Respondents being made aware of law violations prior to the 2022 primary election**. Petitioners don't believe that changes will be made to redress the problems in future elections, since no attempt at redress was made for the 2020 presidential election.** Petitioners seek redress for the abuse and devastation of his/her Constitutional rights and protections from our elected officials. Petitioners have been called derogatory names such as 'a conspiracy theorists' to undermine valid concerns and labeled a 'domestic terrorist' by the U.S. D.O.J. Yet, Petitioners remain undaunted to seek redress for the violation of his/her rights.

> "In my humble opinion, those who come to engage in debates of consequence, and who challenge accepted wisdom, should expect to be treated badly. Nonetheless, they must stand undaunted. That is required. And that should be expected. For it is bravery that is required to secure freedom."
> --*Clarence Thomas*

We come before this court with the acquired knowledge that We the People are free solely on paper. We have exercised our constitutional rights to duly elect state and federal officials who have been ineffective in their official capacity due to lack of integrity and accountability.

> "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.

Other rights, even the most basic, are illusory if the right to vote is undermined." -
- *Wesberry v. Sanders,* 376 U.S. 1, 10 (1964).

Lawful elections are the backbone of our local, state, and national government. The right to vote is protected by the Equal Protection Clause and the Due Process Clause. *U.S. CONST. amend. XIV, § 1, cl. 3-4*. Because "the right to vote is personal," *Reynolds,* 377 U.S. at 561-62. "[e]very voter in a federal … election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote *fairly* counted." *Anderson v. United States,* 417 U.S. 211, 227 (1974); *Baker v. Carr,* 369 U.S. 186, 208 (1962). Invalid or fraudulent votes debase or dilute the weight of each validly cast vote. *Bush II, 531 U.S. at 105*. The unequal treatment of votes within a state, and unequal standards for processing votes raise equal protection concerns.

Justice Thomas wrote in his Dissent regarding The *State of Texas v. Pennsylvania*:

> "Here, we have the opportunity to do so almost two years before the next federal election cycle. Our refusal to do so by hearing these cases is befuddling. One wonders what this Court waits for. We failed to settle this dispute before the election, and thus provide clear rules. Now we again fail to provide clear rules for future elections. The decision to leave election law hidden beneath a shroud of doubt is baffling. By doing nothing, we invite further confusion and erosion of voter confidence. Our fellow citizens deserve better and expect more of us. I respectfully dissent"

*State of Texas vs. Commonwealth of Pennsylvania, State of Georgia, State of Louisiana, and State of Wisconsin (2020).* Justice Thomas went on to say; "the court was thought to be the least dangerous branch and we may have become the most dangerous." He further warned against, "destroying our institutions because they don't give us what we want, when we want it." Petitioners believe they deserve better, and expects more from our elected and appointed officials in the judicial, executive, legislative and local government branches.

The elections in Kansas are riddled with inconsistencies, lack of forthcoming information

from local and state officials, uncertified electronic voting systems, as well as Kansas election law and The Help America Vote Act (HAVA) of 2002 violations.  Petitioners bring this case forward to protect the first amendment constitutional rights expressed through voting and "It is the duty of the courts to be watchful for the Constitutional rights of the citizen and against any stealthy encroachments thereon." [*Boyd v. United States*, 116 U.S. 616, 635].

## ATTEMPTS AT MITIGATION

Petitioner, Thad Snider, shared provable fraud evidence in Johnson County elections on December 6, 2021 to the Johnson County Election Officials, Johnson County Legal, Kansas Senate & House representatives, the District Attorney, the Johnson County Sheriff, and the Defendants.

From: Thad Snider <███████████████>
Date: Mon, Dec 6, 2021 at 11:25 AM
Subject: Provable Fraud - Johnson County - 11/02/2021 Election
To: Dunham, Cynthia, LGL <Cynthia.Dunham@jocogov.org>, Sherman, Fred, ELC
<Fred.Sherman@jocogov.org>
Cc: <ron.ryckman@house.ks.gov>, <dan.hawkins@house.ks.gov>,
<william.sutton@house.ks.gov>, <blake.carpenter@house.ks.gov>,
<derek.schmidt@ag.ks.gov>, <steve.howe@jocogov.org>, Sheriff Hayden
<calvin.hayden@jocogov.org>, <sos@ks.gov>, Trent, Peg, LGL <Peg.Trent@jocogov.org>,
<Ty.Masterson@senate.ks.gov>, <Larry.Alley@senate.ks.gov>,
<Ron.Ryckman@senate.ks.gov>, <john.resman@house.ks.gov>,
<Mike.Thompson@senate.ks.gov>, Bryan Caskey <Bryan.caskey@sos.ks.gov>, <bocc-
commissioners@jocogov.org>, General <General@ag.ks.gov>


CC: Kansas Attorney General, Derek Schmidt; Johnson County District Attorney, Steve
Howe; Johnson County Sheriff, Calvin Hayden; Secretary of State, Scott Scwabb, State
Elections Director, Bryan Caskey; Board of County Commissioners for Johnson County;
Johnson County Election Director, Fred Sherman; Peggy Trent, Chief Counsel for Johnson
County; KS President of the Senate, Ty Masterson; KS Senate Majority Leader, Larry Alley;
KS Speaker of the House, Ron Ryckman; House Majority Leader, Dan Hawkins; Chair of the
Elections Committee, Vice-Chair of the Elections Committee, Blake Carpenter, KS House
Rep John Resman; KS Senator Mike Thompson

Thad  outlined  various  law  violations,  including  illegal  drop  boxes,  chain  of  custody  law

violations, lack of proper certification for electronic voting machines and parts.

Thad states:

> "I made the Board of County Commissioners/the canvassers, Johnson County District Attorney Howe and Johnson County Sheriff Hayden aware of this in an email dated 12/01/2021. *NOTE: None of the recipients have yet to respond to that via email but I did speak the Sheriff's Department and the District Attorney's office has said I will receive a call on 12/06/2021.*"

He concludes his email by stating:

> "Changing election laws or mean by which we conduct our election is Constitutional responsibility which lies solely with the Legislature. The Secretary of State usurped that authority by changing/adding to election processes which is a grave Constitutional violation, and the use of drop boxes should be ended immediately until such time the legislature has a chance to enact law affording the use of the drop boxes. This combined with the lack of certification for our electromechanical systems calls into question the validity of every election that has utilized these different systems since at least 2018.
>
> I have copied in various members of the House & Senate Leadership to this email so they can be aware of the Constitutional and statutory violations that have occurred here by the Johnson County Board of Commissioners, the Johnson County Elections Director, The Secretary of State and the Johnson County Legal Counsel. I have also copied in the various law enforcement officials who have the capacity and Constitutional duty to pursue these crimes to the legal end.
>
> It is my belief, through a preponderance of evidence my personal 1st, 4th & 14th amendment Rights have been violated in both the administration of the election in my pursuit of these truths. Not to mention, these are the additional Kansas Statutes I believe have been violated:
>
> > - 25-2411. Election perjury
> > - 25-2414. Possessing false or forged election supplies
> > - 25-2419. Misconduct of an election officer
> > - 25-2420. Election fraud by an election officer
>
> The remedy for these violations is also laid out in statute:
>
> > - 25-2432. Forfeiture of office or employment upon conviction
>
> I have spent a tremendous amount of time and effort to uncover these crimes because I take my Rights seriously and as should all of you. I have just informed every single Constitutionally-appointed protector of my Rights and with authority over this matter via this email and I have just laid out a massive criminal case and a possible conspiracy to

defraud the People of Johnson County of their Constitutionally-protected Right to vote. I have done my part. Question is, what are all of you going to do about it?

Thank you,

Thad Snider

*PS: Let this email serve as notice to everyone on this email chain of potential criminal and civil action to follow. Preserve and protect all records including but not limited to: written, electronic or other means of communication; memorandums, documents, phone records, government-issued cell phones and all election records stemming from or pertaining to the November 3rd, 2020 election and the November 2nd, 2021 election as well as any correspondence with regard to myself (Thad Snider) and my efforts to expose all of this. This includes any surveillance footage of the ballot dropboxes and/or the county election office during before, during and after those previously mentioned elections."*

## STATEMENT OF FACTS

27. The oath of office of all government officials before entering upon the duties of their respective office is as follows: "*I do solemnly swear [or affirm, as the case may be] that I will support the constitution of the United States and the constitution of the state of Kansas, and faithfully discharge the duties of the office of [office]. So help me God.*". **Kansas Constitution Art 15, § 14** and **K.S.A. Art. 1 § 54-106**.

28. The next election is November 8, 2022.

29. The State Elections Director's role is to work on every issue related to elections: cybersecurity, voting machines, candidate filing, voting technology, voter registration, voter ID, and more. The Elections Director reports to the Secretary of State.[3]

30. The Secretary of State is an elected official, also is the Chief Election Official, who oversees the conduct of elections in their state in accordance with state and federal laws.

---

[3] https://www.nased.org/about-nased

31. The Attorney General of Kansas Office provides legal services to state agencies and boards, promotes open and accountable government, issues Attorney General's Opinions, protects consumers from fraud, assists the victims of crime and defends the state in civil proceedings.[4]

32. The Governor of Kansas serves as the chief executive officer of the Kansas and is responsible for implementing state laws and overseeing the operation of the state executive branch.

33. *Kansas Constitution Article 4 § 1. Mode of voting.* states, "All elections by the people shall be by ballot or voting device, or both, as **the legislature shall by law provide**."

34. *Kansas Constitution Article 2 § 20.* Enacting clause of bills: laws enacted only by bill. states, "… **No law shall be enacted except by bill**."

35. "When interpreting a statute, we look first to the language." *Richardson v. United States*, 526 U.S. 813, 818 (1999).

36. "As in any case of statutory construction, our analysis begins with the language of the statute. … And where the **statutory language** provides a clear answer, it ends there as well." *Hughes Aircraft Co. V. Jacobson*, 525 U.S. 432, 438 (1999).

37. The statutory instruction "comes in terms of the mandatory '**shall**,' which normally creates an **obligation impervious to judicial discretion**." *Lexicon Inc. v. Mil berg Weis Bershad Hynes & Lerach*, *523 U.S. 26, 35* (1998).

38. The *U. S. Constitution Fifteenth Amendment Section 1* states, "The right of citizens of the United States to **vote shall not be denied or abridged** by the United States or by any state on account of race, color, or previous condition of servitude."

39. The *U. S. Constitution Nineteenth Amendment* states, "The right of citizens of the United States to **vote shall not be denied or abridged** by the United States or by any state on account of sex."

---

[4] https://ag.ks.gov/about-the-office/divisions

40. Petitioners and voters in Kansas feel their vote was abridged. It should be the responsibility of those who oversee the elections in Kansas to *prove* to those voters their vote counted *as they intended*. A simple recount does not satisfy this concern.

41. The definition of abridged from the Merriam-Webster dictionary is "shortened or condensed especially by the omission of words or passages[5]." and from Blacks Law Dictionary 6th edition is "to reduce or contract; to diminish or curtail."

42. In the case of voting, the vote is "abridged" when the **vote is shortened or not fully counted**, which could be a result of election fraud, fractional votes, or other methods that falsely impacts the true election results.

43. In the 1972 decision in *Dunn v. Blumstein*, Justice Marshall stated, "In decision after decision, this Court has made clear that a citizen has a **constitutionally protected right to participate in elections on an equal basis with other citizens** in the jurisdiction."

44. "[T]o participate in elections on an equal basis with other citizens in the jurisdiction" every vote needs to have the same weight. One person's vote cannot count for more or less than a single vote. Fractional voting by electronic voting machine software cannot be used.

45. Each County manages their elections. Counties across Kansas are contracted with Election Systems & Software (ES&S), Dominion, ClearBallot, and Unisyn as the manufacturer for electronic voting machines and software.

46. Each of the 105 counties in Kansas have a county election officer responsible for conducting all official elections held in the county. In the four largest counties - Johnson, Sedgwick, Shawnee and Wyandotte - the election officer is the election commissioner, appointed by the secretary of state. For the other 101 counties it is the county clerk, elected by the voters in the county.

[5] https://www.merriam-webster.com/dictionary/abridged

**UNCERTIFIED ELECTRONIC VOTING SYSTEMS, VIOLATION OF THE KANSAS ELECTION LAWS & HAVA ACT**

*The 2020 Presidential Election was Unlawfully Certified*

47. On November 3, 2020, the State of Kansas attempted to conduct an election for President of the United States of America.

48. Pursuant to Kansas law, the secretary of state **shall** examine and approve the kinds or makes of systems using optical scanning equipment, including operating systems, firmware and software, and no kind or make of such system shall be used at any election unless and until it receives certification by the secretary of state and a statement thereof is filed in the office of the secretary of state. *K.S.A. 25-4404.* (emphasis added).

49. Pursuant to Kansas Law, mandatory requirements for electronic voting systems approved "**shall meet the requirements** of the **help America vote act of 2002** and other federal statutes and regulations governing voting equipment. *K.S.A 25-4406(m).* (emphasis added).

50. HAVA Section 231(b) (*42 U.S.C. §15371(b)*) **requires** that the EAC provide for the *accreditation* and revocation of accreditation of independent, non-federal laboratories qualified to **test voting systems to Federal standards**.

51. If voting hardware and/or software has not been lawfully certified pursuant to the Help America Vote Act of 2002, then said voting machine may not be used in a Kansas election. *See K.S.A. 25-4406(m)*.

52. If a voting hardware and/or software has not been tested and approved by a laboratory that is accredited pursuant to the Help America Vote Act of 2002, then said voting hardware or software may not be used in a Kansas election. *See id.*

53. If voting hardware and/or software were used in violation of Kansas law, then said election is void *ab initio* and said election cannot be lawfully certified by any Respondent. *See id.*

54. Void *ab initio* is defined as "Having no legal effect from inception." Thompson Reuters Practical Law, definition of "Void *ab initio*" last visited September 10, 2022[6]

55. Void *ab initio* means that the action taken is void; it is not voidable. *See id.*

56. Void *ab initio* means that the action taken "has no legal effect." *See id.*

57. "A void action cannot be ratified or validated [or certified]." *See id.*

58. "An action that is void ab initio never had any legal effect." *See id* (emphasis added).

Glossary
**Void ab initio**

Having no legal effect from inception.

A law, agreement, sale, or other action that is void has no legal effect. A void action cannot be ratified or validated. An action that is void *ab initio* never had any legal effect. *Ab initio* is usually italicized because it is a Latin term that means from the beginning.

Void and void *ab initio* have the same technical definition, but void *ab initio* is a stronger term that is less likely to be improperly confused with voidable.

END OF DOCUMENT

RESOURCE ID   W-027-8278        DOCUMENT TYPE   GLOSSARY

PRODUCTS
PLC Arbitration - International, PLC US Antitrust, PLC US Bankruptcy & Restructuring, PLC US Capital Markets & Corporate Governance, PLC US Commercial Litigation, PLC US Commercial Transactions, PLC US Corporate and M&A, PLC US Corporate and Securities, PLC US Employee Benefits and Executive Compensation, PLC US Federal Litigation, PLC US Finance, PLC US Glossary, PLC US Government Practice: Federal, PLC US Government Practice: State & Local, PLC US Health Care, PLC US Intellectual Property and Technology, PLC US Labor and Employment, PLC US Law Department, PLC US Legal Operations & Professional Development, PLC US Life Sciences & FDA Regulatory, PLC US Real Estate, PLC US Securities Litigation & Enforcement, PLC US Tax, PLC US Trusts & Estates

© 2022 THOMSON REUTERS. NO CLAIM TO ORIGINAL U.S. GOVERNMENT WORKS.

59. For Kansas to conduct a valid election, the Kansas Secretary of State must comply with the requirements contained in *K.S.A. 25-4404, K.S.A. 25-4406(m).*

---

[6]
https://uk.practicallaw.thomsonreuters.com/Glossary/PracticalLaw/I41334c8d07ef11ebbea4f0dc9fb69570?transitionType=Default&contextData=(sc.Default)&firstPage=true

60. If the legal requirements contained in *K.S.A. 25-4404, K.S.A. 25-4406(m)* were not met, then the Kansas Secretary of State had no authority to use any voting machine or device in violation of said statute.

61. If the legal requirements contained in *K.S.A. 25-4404, K.S.A. 25-4406(m)* were not met, then the Defendants had no authority to certify the results of Kansas 2020 presidential election and all 2020 presidential election certification signatures are void *ab initio*.

62. The governor, secretary of state and attorney general shall constitute the state board of canvassers. Any two of such members may act for such board. *K.S.A. 25-3201*

63. The state board of canvassers met on November 30, 2020 to certify the 2020 presidential election for the state of Kansas.



64. If none of the Respondents had the legal authority to certify the Kansas 2020[7] presidential election results, then this Court must issue a peremptory writ of mandamus against each named Respondent who is on the Kansas Board of Canvassers, compelling them to decertify Kansas' 2020 presidential election and to rerun Kansas' 2020 presidential election in accordance with Kansas law.

    a.   Majority of the electronic voting machines that were used in the 2020 presidential election were not certified by an ***accredited*** Voting System Test Laboratory for 67 out of 105 counties.

# VOTING SYSTEM TEST LABORATORIES (VSTL)

Section 231(b) of the **Help America Vote Act (HAVA) of 2002** 📄 (42 U.S.C. §15371(b)) requires that the EAC provide for the accreditation and revocation of accreditation of independent, non-federal laboratories qualified to test voting systems to Federal standards. Generally, the EAC considers for accreditation those laboratories evaluated and recommend by the **National Institute of Standards and Technology** (NIST) pursuant to HAVA Section 231(b)(1). However, consistent with HAVA Section 231(b)(2)(B), the Commission may also vote to accredit laboratories outside of those recommended by NIST upon publication of an explanation of the reason for any such accreditation.

    b.   ALL electronic voting machines that were used in the Kansas 2020 presidential election were not certified using the EAC approved VVSG version 1.1 testing standard.

---

[7] And every election held since such time the electromechanical voting systems were not legally certified.

**Minutes of the Public Meeting**
**United States Election Assistance Commission**

Held at

Ritz-Carlton Pentagon City
1259 South Hayes Street
The Diplomat Room
Arlington, Virginia 22202

The following are the Minutes of the Public Meeting of the United States Election Assistance Commission (EAC) held on Wednesday, January 6, 2016.  The meeting convened at 10:02 a.m., EDT.  The meeting was adjourned at 11:04 a.m., EDT.

Commissioner Masterson made a motion to adopt full implementation for VVSG 1.1 at the date 18 months from today's vote with no new systems being tested to the 2005 VVSG after that date.  Commissioner Hicks seconded the motion.  The motion carried unanimously.

*The 2020 Presidential Election Equipment Non-Compliance*

65. Kansas Law requires participation in the Voting System Test Laboratory Accreditation

Program, developed by the EAC. See *K.S.A. 25-4404, K.S.A. 25-4406(m).*

66. The Help America Vote Act of 2002 created "the Election Assistance Commission" and the

Election Assistance Commission (EAC) is referred to in the Act as the "Commission." **52**

**U.S.C. § 20921** (formerly cited as 42 U.S.C. § 15321).

> 52 U.S.C.A. § 20921
> Formerly cited as 42 USCA § 15321
>
> ### § 20921. Establishment
>
> Currentness
>
> There is hereby established as an independent entity the Election Assistance Commission (hereafter in this subchapter referred to as the "Commission"), consisting of the members appointed under this subpart. Additionally, there is established the Election Assistance Commission Standards Board (including the Executive Board of such Board) and the Election Assistance Commission Board of Advisors under subpart 2 of this part (hereafter in this subpart referred to as the "Standards Board" and the "Board of Advisors", respectively) and the Technical Guidelines Development Committee under subpart 3 of this part.

67. The Election Assistance Commission "**shall** serve as a national clearinghouse and resource for the compilation of information and review of procedures with respect to the administration of Federal elections by -- … (2) carrying out the duties described in part B of this subchapter (relating to the testing, certification, decertification, and recertification of voting system hardware and software)…." *52 U.S.C. § 20922* (formerly cited as 42 U.S.C. § 15322).

> 52 U.S.C.A. § 20922
> Formerly cited as 42 USCA § 15322
>
> ### § 20922. Duties
>
> Currentness
>
> The Commission shall serve as a national clearinghouse and resource for the compilation of information and review of procedures with respect to the administration of Federal elections by--
>
> **(1)** carrying out the duties described in subpart 3 of this part (relating to the adoption of voluntary voting system guidelines), including the maintenance of a clearinghouse of information on the experiences of State and local governments in implementing the guidelines and in operating voting systems in general;
>
> **(2)** carrying out the duties described in part B of this subchapter (relating to the testing, certification, decertification, and recertification of voting system hardware and software);

68. The Election Assistance Commission "**shall provide for the** testing, **certification**, decertification, and recertification of voting system hardware and software by accredited

laboratories." ***52 U.S.C. § 20971(a)(1)*** (formerly cited as 42 U.S.C. § 15371) (emphasis added).

---

52 U.S.C.A. § 20971

Formerly cited as 42 USCA § 15371

## § 20971. Certification and testing of voting systems

Currentness

**(a) Certification and testing**

**(1) In general**

The Commission shall provide for the testing, certification, decertification, and recertification of voting system hardware and software by accredited laboratories.

**(2) Optional use by States**

At the option of a State, the State may provide for the testing, certification, decertification, or recertification of its voting system hardware and software by the laboratories accredited by the Commission under this section.

---

69. Pursuant to the U.S. Election Assistance Commission, there are **only two** Voting System Test Laboratories (VSTL) that are accredited by the Election Assistance Commission: (1) **Pro V&V**; and (2) **SLI Compliance**. U.S. Election Assistance Commission, VOTING SYSTEM TEST LABORATORIES (VSTL)[8]. (emphasis added).

---

[8] https://www.eac.gov/voting-equipment/voting-system-test-laboratories-vstl



# VOTING SYSTEM TEST LABORATORIES (VSTL)

Section 231(b) of the **Help America Vote Act (HAVA) of 2002** (42 U.S.C. §15371(b)) requires that the EAC provide for the accreditation and revocation of accreditation of independent, non-federal laboratories qualified to test voting systems to Federal standards. Generally, the EAC considers for accreditation those laboratories evaluated and recommend by the **National Institute of Standards and Technology** (NIST) pursuant to HAVA Section 231(b)(1). However, consistent with HAVA Section 231(b)(2)(B), the Commission may also vote to accredit laboratories outside of those recommended by NIST upon publication of an explanation of the reason for any such accreditation.



### Pro V&V

6705 Odyssey Dr NW Suite C,
Huntsville, Alabama 35806
Status: Accredited
Program Manager: , President
Phone: 256-713-1111
Learn More >

### SLI Compliance, a Division of Gaming Laboratories International, LLC

4720 Independence Street
Wheat Ridge, Colorado 80033
Status: Accredited
Program Manager: , Director of Operations
Phone: 303-422-1566
Learn More >

2 results found.
page 1 of 1

*Pro V&V Accreditation Lapsed Resulting in Illegally Certified & Used Machines*

70. According to the EAC website, there are 49 counties in Kansas that use either Clear Ballot,

Dominion, ES&S or Unisyn manufactures that are certified by Pro V&V Labs[9].



[9] https://www.eac.gov/voting-equipment/system-certification-process



71. Petitioners, Katie Roberts and Rosemary Walker used the EAC website[10] to identify for each

county; the manufacturer, voting system, system version and lab certified. By clicking each

Voting System, the details for each will show as follows. Since the argument is the same for

ALL voting systems certified by ProV&V labs, please see the table below:

---

[10] https://www.eac.gov/voting-equipment/system-certification-process this information was put into a spreadsheet to analyze the data per county. Only 92 counties were accounted for being EAC compliant.

## DEMOCRACY SUITE 5.5

**Manufacturer**

Dominion Voting Systems Corp

**Testing standard**

VVSG 1.0 (2005)

**Testing Lab**

Pro V&V

**Certification Date**

09/14/18

| Current Voting System Certifications in Kansas Counties | | | | | |
|---|---|---|---|---|---|
| # Counties in Kansas | Manufacturer | Voting System | Version | Lab | Certified Date |
| 13 | ES&S | EVS | 5.2.2.0 | NTS Huntsville | Expired |
| 1 | ES&S | EVS | 5.2.1.0 | NTS Huntsville | Expired |
| 4 | ES&S | EVS | 5.2.1.1 | NTS Huntsville | Expired |
| 15 | Dominion | D-Suite | 5.5 | ProV&V | 9/14/18 |
| 21 | ES&S | EVS | 6.0.2.0 | SLI | 10/4/18 |
| 4 | ES&S | EVS | 6.0.4.0 | SLI | 5/3/19 |
| 29 | Unisyn | OpenElect | 2.1 | ProV&V | 5/5/19 |
| 4 | ES&S | EVS | 6.1.1.0 | ProV&V | 7/27/20 |
| 1 | Clear Ballot | ClearVote | 2.2 | ProV&V | 12/23/21 |
| 13 | Missing information on EAC Website | | | | |

72. During the 2020 presidential election the voting machines with Dominion Democracy Suite 5.5, Unisyn OpenElect 2.1, ES&S EVS 6.1.1.0, and Clear Ballot ClearVote 2.2 were used in 49 counties across Kansas, all certified by Pro V&V. U.S. Election Assistance Commission System Certification Process[11].

---

[11] https://www.eac.gov/votingequipment/system-certification-process.



73. Pursuant to the U.S. Election Assistance Commission's website, Pro V&V received a

Certificate of Accreditation on February 24, 2015. U.S. Election Assistance Commission,

Voting System Test Laboratories[12].



[12] https://www.eac.gov/voting-equipment/voting-system-test-laboratories-vstl/pro-vv

74. Pursuant to Version 2.0 of the Voting System Test Laboratory Program Manual, which was

effective May 31, 2015, "*A grant of accreditation is valid for a period not to exceed two*

*years*." Voting System Test Laboratory Program Manual, p. 39, § 3.8[13].

3.6.1.  Certificate of Accreditation. A Certificate of Accreditation shall be issued to each laboratory accredited by vote of the Commissioners.  The certificate shall be signed by the Chair of the Commission and state:

3.6.1.1.  The name of the VSTL;

3.6.1.2.  The scope of accreditation, by stating the Federal standard or standards to which the VSTL is competent to test;

3.6.1.3.  The effective date of the certification, which shall not exceed a period of two (2) years; and

3.6.1.4.  The technical standards to which the laboratory was accredited.

**Voting System Test Laboratory Program Manual, Version 2.0**

3.7.4.  Accreditation Logo.  A VSTL may display the EAC laboratory accreditation logo.  Only the EAC authorized logo may be used.  The display must be used in a manner consistent Sections 3.7.1. - 3.7.3., above.  Specifications for the reproduction and use of the EAC logo are found in Appendix D.

3.8.  Expiration and Renewal of Accreditation.  A grant of accreditation is valid for a period not to exceed two years.  A VSTL's accreditation expires on the date annotated on the Certificate of Accreditation.  VSTLs in good standing shall renew their accreditation by submitting an application package to the Program Director, consistent with the procedures of Section 3.4 of this Chapter, no earlier than 60 days before the accreditation expiration date and no later than 30 days before that date.  Laboratories that timely file the renewal application package shall retain their accreditation while the review and processing of their application is pending.  VSTLs in good standing shall also retain their accreditation should circumstances leave the EAC without a quorum to conduct the vote required under Section 3.5.5.

---

[13]

https://www.eac.gov/sites/default/files/eac_assets/1/28/VSTLManual%207%208%2015%20FINAL.pdf

75. Pro V&V received its certification on **February 24, 2015**.



76. Pro V&V's Certificate of Accreditation **expired** on **February 24, 2017**.

77. On November 3, 2020, Pro V&V was **not** accredited by the U.S. Election Assistance

Commission. U.S. Election Assistance Commission, https://www.eac.gov/voting-

equipment/voting-system-test-laboratories-vstl/pro-vv



78. Pro V&V's most recent Certificate of Accreditation is dated **February 01, 2021**.



79. Pro V&V did not receive another renewal of accreditation until January 27, 2021 with a signed

Certificate of Accreditation on February 1, 2021, which was after the November 3, 2020

presidential election and lapsed the two-year requirement.

    a.   Pro V&V's accreditation from February 24, 2015 was effective through February 24,

        2017, however was not re-accredited until February 1, 2021 - therefore any electronic

        voting machines purchased at the county level after February 24, 2017, were ***NOT***

        ***legally certified***, thus violating HAVA and Kansas election laws, resulting in illegal

        elections in 2018, 2019, 2020 which never should have been certified by the county or

        state board of canvassers.

80. Since Kansas law expressly requires its voting "machines or devices" to have been "tested and approved by a laboratory that is accredited pursuant to the help America vote act of 2002" and Pro V&V was not accredited on November 5, 2019, it was unlawful and illegal for the Respondents to certify Kansas 2020 presidential election when said results included Kansas county votes using systems which were void *ab initio* and un-certifiable.

81. The Dominion (15 counties), Unisyn (29 counties), ES&S (4 counties), and ClearBallot (1 county) voting systems allegedly were certified (according to the EAC website) during the time that Pro V&V accreditation expired, therefore all voting hardware and software that was used in these 48 Kansas counties for the 2020 presidential election failed to comply with *K.S.A. 25-4404, K.S.A. 25-4406(m)*; said election was unlawful (and all elections in that time-frame).

| # Counties in Kansas | Manufacturer | Voting System | Version | Lab | Certified Date |
|---|---|---|---|---|---|
| **Current Voting System Certifications in Kansas Counties** | | | | | |
| 13 | ES&S | EVS | 5.2.2.0 | NTS Huntsville | Expired |
| 1 | ES&S | EVS | 5.2.1.0 | NTS Huntsville | Expired |
| 4 | ES&S | EVS | 5.2.1.1 | NTS Huntsville | Expired |
| 15 | Dominion | D-Suite | 5.5 | ProV&V | 9/14/18 |
| 21 | ES&S | EVS | 6.0.2.0 | SLI | 10/4/18 |
| 4 | ES&S | EVS | 6.0.4.0 | SLI | 5/3/19 |
| 29 | Unisyn | OpenElect | 2.1 | ProV&V | 5/5/19 |
| 4 | ES&S | EVS | 6.1.1.0 | ProV&V | 7/27/20 |
| 1 | Clear Ballot | ClearVote | 2.2 | ProV&V | 12/23/21 |
| 13 | Missing information on EAC Website | | | | |

82. ClearBallot, ClearVote 2.2 was testing during the lapse of Pro V&V accreditation.



83. The 2020 presidential election included votes from 47% of all counties in Kansas that used machines that were uncertified by a Voting System Test Laboratory (VSTL) with an accreditation in good standing at the time of system testing.  Pursuant to Version 2.0 of the Voting System Test Laboratory Program Manual, a VSTL ***must be re-accredited every 2 years***. These votes are illegal per Kansas law and HAVA and should have not been certified by Respondents.

84. Further corroborated evidence of  invalid EAC certifications for most of the electronic voting machines (apparently across the county), see Declaration of Terpsehore P Maras in ***Exhibit Q*** and the official Complaint[14] against the Georgia State Election Board also claiming Pro V&V not only lapsed their accreditation beyond the 2 year requirement, but more egregiously, there is evidence of a cover up by EAC by falsifying documentation, which calls into question the EAC's integrity:   https://electionoversight.substack.com/p/invalid-eac-certification

---

[14] https://www.thegatewaypundit.com/2022/09/citizen-investigators-find-bombshell-fabricated-documents-submitted-georgia-state-elections-board/

*VSTL's Not Compliant with EAC Testing Standards*

85. The Help America Vote Act (HAVA) of 2002 was passed by the United States Congress to

make sweeping reforms to the nation's voting process. HAVA creates new mandatory

minimum standards for states to follow in several key areas of election administration. The

*law* provides funding to help states meet these new standards, replace voting systems and

improve election administration. HAVA also established the Election Assistance Commission

(EAC) to assist the states regarding HAVA compliance and to distribute HAVA funds to the

states. EAC is also charged with creating voting system guidelines and operating the federal

government's first voting system certification program[15].

86. Voluntary Voting System Guidelines (VVSG) are the testing standards. The EAC states that:

The purpose of the guidelines is to provide a set of specifications and requirements against

which voting systems can be tested to determine if they provide all the basic functionality,

accessibility, and security capabilities required of voting systems. There are currently three

adopted VVSG standard versions: 1.0, 1.1 and 2.0.

   a. The EAC adopted Version **1.0** on **December 13, 2005**

   b. The EAC adopted Version **1.1** on **March 31, 2015**

   c. The EAC adopted Version **2.0** on **February 10, 2021**, which is a major update to the

   VVSG 1.1. The VVSG 2.0 is the most current federal guidelines to be formally

   adopted[16].

---

[15] https://www.eac.gov/about_the_eac/help_america_vote_act.aspx

[16] https://www.ncsl.org/research/elections-and-campaigns/voting-system-standards-testing-and-certification.aspx



87. All Electronic Voting Machines to date are only certified and tested to VVSG 1.0, which was adopted in 2005, implemented 18 months later. These testing standards predate the smart phone and are currently being used in 2022, when security vulnerabilities are much more advanced and complex.

88. According to the EAC Voluntary Voting System Guidelines v. 1.1 handbook, "VVSG 1.1 will take effect after their final adoption by the EAC. At that time, there will be a transition period to move from the 2005 VVSG to VVSG 1.1. At a date to be determined by EAC Commissioners, **EAC will fully transition to VVSG 1.1 and manufacturers will no longer be able to test to the 2005 VVSG for a full system certification.** Modifications to a system certified to the 2005 VVSG after this date will be tested against the VVSG 1.1".[17]

89. On January 6, 2016, the **Commission adopted** an implementation plan whereby all new voting systems would be **required** to be tested against **VVSG 1.1 beginning on July 6, 2017**; 18 months after the new system was approved. (*Exhibit C*, pg 3)

---

[17] https://www.eac.gov/sites/default/files/eac_assets/1/28/VVSG.1.1.VOL.1.FINAL1.pdf

### Minutes of the Public Meeting
### United States Election Assistance Commission

Held at

Ritz-Carlton Pentagon City
1259 South Hayes Street
The Diplomat Room
Arlington, Virginia 22202

The following are the Minutes of the Public Meeting of the United States Election Assistance Commission (EAC) held on Wednesday, January 6, 2016.  The meeting convened at 10:02 a.m., EDT.  The meeting was adjourned at 11:04 a.m., EDT.

Commissioner Masterson made a motion to adopt full implementation for VVSG 1.1 at the date 18 months from today's vote with no new systems being tested to the 2005 VVSG after that date.  Commissioner Hicks seconded the motion.  The motion carried unanimously.

90. According to Brian Newby, EAC Executive Director and Jessica Myers, Sr. Certification Program Specialist for EAC, stated in a presentation on April 4, 2017 (***Exhibit D***, pg 7) that VVSG 1.0 will **sunset July 6, 2017** (which is 18 months post adoption) as planned per the implementation plan. ***Therefore, all electronic voting systems purchased after July 2017 must be certified to VVSG 1.1.***

91. A GAO Audit report[18] dated April 2018 to congress clearly states on pages 23 & 24:

> "After the EAC's creation, in 2005, the EAC developed and adopted the third iteration of ***federal*** standards, in accordance with HAVA, and the standards were renamed the Voluntary Voting System Guidelines (VVSG). This third iteration of federal voting system guidelines was referred to as the 2005 VVSG or VVSG 1.0, as it is called today. According to the EAC, VVSG 1.0 increased security requirements for voting systems and were intended to expand access, including opportunities to vote privately and independently, for individuals with disabilities. In 2006, the National Association of State Election Directors terminated its voting system testing

---

[18] https://www.gao.gov/assets/700/692024.pdf

program and subsequently, in 2007, the EAC launched its own testing and certification program. In March 2015, a fourth iteration of the voluntary guidelines was adopted by the EAC, referred to as VVSG 1.1. According to the EAC, VVSG 1.1 clarified the guidelines to improve testability by testing laboratories, among other updates, and focused on areas that could be improved without requiring significant changes to the testing and certification process. ***In January 2016, the EAC adopted an implementation plan for VVSG 1.1 whereby all new voting systems being tested for certification would be required to be tested against the VVSG 1.1 beginning on July 6, 2017. As of November 2017, no voting systems have been certified using VVSG 1.1.***."

92. According to the April 2018 GAO audit report to congress, no electronic voting machine (including Kansas) is certified to VVSG 1.1 as required by *K.S.A. 25-4406(m)* and HAVA as of July 6, 2017, when the EAC planned to sunset/decommission VVSG 1.0. ***Exhibit E***

93. A Kansas Open Records Request (KORA) to acquire all past and current Secretary of State certification letters to the various system manufactures has revealed that Kansas electronic voting machines are only certified to the VVSG 1.0 version from 2005, a 17-year gap in security of elections. ***Exhibit F.***

94. Additionally, at "the option of a State, the State may provide for the testing, certification, decertification, or recertification of its voting system hardware and software by the laboratories accredited by the Commission under this section." ***52 U.S.C. § 20971(a)(2)*** (formerly cited as 42 U.S.C. § 15371).

95. Kansas Elections & Voting Systems guidelines by Secretary of State, Chapter 6 (a) "Before any voting system, equipment or software may be purchased or used by a county, it must be certified by the Secretary of State.



## Chapter VI.   Voting Systems

*Revised  7/17/19*

**a. Certification**

Before any voting system, equipment or software may be purchased or used by a county, it must be certified by the Secretary of State. Manufacturers and vendors apply directly to the Secretary of State to have their systems reviewed and certified. The certification process used by the Secretary of State is as follows:

a. Kansas violated the EAC requirements by having elections certified using machines that were purchased after July 6, 2017, which were tested and certified using the obsolete version of VVSG 1.0.  All electronic voting machines in Kansas as of September 2022 are certified to VVSG 1.0, making all elections since 2017 null and void. Electronic voting machines *in Kansas are required by law to follow EAC guidelines*, which have clearly stated that as of July 6, 2017, VVSG 1.0 will no longer be accepted for the certification of __new__ systems, which is the case for some counties, or modified systems requiring re-certification.

b. While the EAC guidelines are voluntary, most states, including Kansas, **require** their voting machines conform to EAC guidelines, which means if they sunset a standard, it is not allowed to be used when certifying new machines or modified machines requiring recertification. K.S.A. 25-4406(m).

---

### KANSAS

*State Participation:*   **Requires testing to federal standards.** KS requires that its voting systems are approved by the Secretary of State and that they are in compliance with voting system standards required by HAVA.

---

c. **K.S.A. 75-407.**   Official seal. The secretary of state shall procure and keep an official seal, having such appropriate design as the secretary of state shall designate, to be surrounded by the words, "secretary of state—state of Kansas." Such seal **shall be used to authenticate** all official certificates to copies of all papers, writings or documents legally deposited in the office of such secretary, and all certificates of election, and every other certificate the secretary is by law required to make.

    d.   From a KORA request by the Petitioners, it was evident that several of the Kansas

        Secretary of State letters of approval of certifications violated K.S.A. 75-407. See

        ***Exhibit F.***



        i.   This (and others) document's authentication is in question as it was ***NOT*** on

           official Secretary of State letterhead, violating ***K.S.A. 75-407***.  In addition the

           letter was signed digitally.

96. Scott Schwab, Secretary of State violated ***K.S.A. 25-4406(m).*** Electronic or electromechanical

voting systems approved by the secretary of state: "**shall** meet the requirements of the help

America vote act of 2002 and other federal statutes and regulations governing voting

equipment.

a. November 16, 2020, Scott Schwab sent the Kansas Legislature a memo (**Exhibit P**) defending Dominion voting systems in the midst of online claims of vote flipping he calls "misinformation" and then continues to classify these reports as, "domestic bad actors are promoting this misinformation to sow distrust in the 2020 election results." He also states, "***Before any voting system,  equipment or software may be purchased or used by a county in Kansas, it must be certified by the Secretary of State.*** Manufacturers and vendors apply directly to the Secretary of State to have their systems reviewed and certified. There are multiple election safeguards - from testing and ***certification of voting systems***, to canvassing and auditing - preventing malicious actors from tampering with vote counts and ensuring final vote tallies are accurate."

b. Kansas have Dominion machines using version 5.5 in 15 counties in Kansas.

c. According to a CISA vulnerability report[19] dated June 3, 2022, outlines 9 severe vulnerabilities to the Dominion systems using version 5.5 that could allow:

    i. An application which could be leveraged by an attacker to gain elevated privileges on a device and/or install malicious code.

    ii. An attacker to directly access the operating system. An attacker could leverage this vulnerability to escalate privileges on a device and/or install malicious code.

    iii. Software can be manipulated to cause arbitrary code execution by specially crafted election definition files. An attacker could leverage this vulnerability to spread malicious code to ImageCast X devices from the EMS.

    iv. The authentication mechanism used by technicians to execute code with elevated privileges by exploiting a system level service. An attacker could

---

[19] https://www.cisa.gov/uscert/ics/advisories/icsa-22-154-01

leverage this vulnerability to escalate privileges on a device and/or install
malicious code.

    v.   An attacker with physical access may use this to gain administrative privileges
on a device and install malicious code or perform arbitrary administrative
actions.

    vi.   The authentication mechanism used by poll workers to administer voting. An
attacker could leverage this vulnerability to gain access to sensitive information
and perform privileged actions, potentially affecting other election equipment.

    vii.   The authentication mechanism used by voters to activate a voting session. An
attacker could leverage this vulnerability to print an arbitrary number of ballots
without authorization.

d.   This system was tested and certified by the Secretary of State in 2019 with the
presumption of being safe for Kansas elections, yet these vulnerabilities were not
found until  J. Alex Halderman, University of Michigan, and Drew Springall, Auburn
University, reported these vulnerabilities to CISA.

e.   There could be many examples of this across the State of Kansas, but through limited
information from KORA requests, it was discovered that Machines were purchased
without being certified by the Secretary of State.

    i.   Thomas County purchased Dominion Machines on June 21, 2017. According to
the EAC website, Thomas County uses Dominion Democracy Suite 5.5.



ii.  Scott Schwab did not grant certification to the Dominion Voting System

Democracy Suite 5.5 until June 18, 2019, which was AFTER the purchase.

June 18, 2019

Mr. Joshua King
ElectionSource
4615 Danvers Drive SE
Grand Rapids, MI 49512

Dear Mr. King:

Pursuant to K.S.A. 25-4404 and 25-4603, this office hereby grants certification to the Dominion
Voting Systems Democracy Suite 5.5. The system includes: ImageCast © Precinct Optical Scan
System – Hardware model 320A/320C running the 5.5.3-0002 firmware; ImageCast © Central –
software version 5.5.3.0002, ImageCast © X – software version 5.5.10.25; Election Management
System software version 5.5.12.1. The Kansas certification number issued to this system is
19-01.

All components have been tested by a qualified independent testing authority, Pro V&V, and
have met the requirements of the Voluntary Voting System Guidelines Version 1.0 (VVSG 1.0).
The Democracy Suite Version 5.5 was issued EAC Certification Number DVS-DEMSUITE 5.5
on September 14, 2018.

Kansas law requires that if any further substantial changes occur in the kind or make of the
equipment, operating system or software, such changes shall be reported to the Secretary of
State. Our office may then require another certification examination in the voting system's
modified form.

If you have questions, please contact my office.

Sincerely,

SCOTT SCHWAB
Kansas Secretary of State

SS/bac

      iii.   Scott Schwab granted certification to Dominion to the Dominion Voting System Democracy Suite 5.5, which was the Pro V&V VSTL, whose accreditation was expired during this purchase.

      iv.  Scott Schwab granted certification to Dominion to the Dominion Voting System Democracy Suite 5.5, which was the Pro V&V VSTL, to VVSG 1.0, which according to EAC should be 1.1 and was not for this purchase.

97. **All systems purchased after July 2017 are certified to VVSG 1.0,** a 17 year old standard (predating a smart phone) when **VVSG 1.1 was <u>required</u> as of July 6, 2017 by EAC,** 18 months post approval. These electronic voting machines and systems are in violation of HAVA and Kansas Law, thus used illegally, concluding that *no* election since July 2017 was legal and should **NOT** have been certified.

98. **All Systems purchased after February 2017 who were certified by Pro V&V** are in violation of HAVA and Kansas Law, thus used illegally and *no* election using these machines since February 2017 was legal and should **NOT** have been certified.

### *HAVA Act Maximum Acceptable Error Rate*

99. ***K.S.A. 25-4406(m)*** requires that voting machines shall meet the requirements of the help America vote act of 2002.

100.    ***HAVA 52-21081(5)*** states "The **error rate** of the voting system in counting ballots (determined by taking into account only those errors which are attributable to the voting system and not attributable to an act of the voter) shall comply with the error rate standards established under section 3.2.1 of the voting systems standards issued by the Federal Election Commission which are in effect on October 29, 2002."

101.     The *Voting Systems Standards* Volume 1 dated April 2002 Section 3.2.1 states "For each

processing function indicated above, the system shall achieve a target error rate of no more

than one in 10,000,000 ballot positions, with a **maximum acceptable error rate** in the test

process of **one in 500,000 ballot positions**."

102.     The Kansas Value Them Both (VTB) amendment recount can be used to check the error

rates of the voting systems in the Kansas counties that had a recount.

103.     With just under 2,000,000 registered voters in the state of Kansas, the maximum

acceptable error rate in the state of Kansas is 4 ballot positions per the testing process

requirements.

104.     The error rate for the Kansas VTB recount **exceeded the maximum acceptable error

rate** and was as follows[20]:

105.     See Affidavit (**Exhibit G**) of Petitioner, Rosemary Walker, personally ran the statistical

calculations for the VTB recount.

106.     When testing the probability that the error rate in Kansas equals the maximum allowable

error rate, we get a standard normal test statistic of 138.19 and a non-parametric chi-squared

test statistic of 19,125. Both versions of the hypothesis tests result in a p-value of 0.00000.

Given the p-value of the tests, we can reject the null hypothesis that the error rate is in line

with the statutory allowable error rate at ALL significance levels.

107.     This means, that there is a 0% chance of having 147 VTB errors if the election system is

in compliance with *HAVA 52-21081(5)***.**

---

[20] https://sos.ks.gov/elections/22elec/2022-Primary-Election-Recounts.xlsx

| County | Primary Votes | | Recount Votes | | Total Errors | Error Rate |
|---|---|---|---|---|---|---|
| | YES | NO | YES | NO | | |
| Douglas | 8,716 | 38,718 | 8,718 | 38,703 | 17 | 1 in 2,790 |
| Johnson | 79,818 | 174,933 | 79,798 | 174,915 | 54 | 1 in 4,718 |
| Sedgwick | 61,824 | 85,923 | 61,843 | 85,885 | 39 | 1 in 3,788 |
| Shawnee | 21,717 | 42,682 | 21,720 | 42,698 | 19 | 1 in 3,389 |
| Crawford | 4,653 | 5,845 | 4,653 | 5,847 | 2 | 1 in 5,249 |
| Harvey | 5,775 | 6,650 | 5,779 | 6,651 | 5 | 1 in 2,485 |
| Jefferson | 2,998 | 3,732 | 2,994 | 3,728 | 8 | 1 in 841 |
| Lyon | 3,625 | 6,265 | 3,625 | 6,264 | 1 | 1 in 9,890 |
| Thomas | 1,721 | 820 | 1,723 | 820 | 2 | 1 in 1,271 |
| Totals | 190,847 | 365,568 | 190,853 | 365,511 | 147 | 1 in 3,785 |

108.    According to the Voting Systems Standards Manual, "For a voting system, accuracy is defined as the ability of the system to capture, record, store, consolidate and report the specific selections and absence of selections, made by the voter for each ballot without error." It doesn't matter how the went about recording the votes in the primary election. The votes were recorded with error, and the voting system that is in place must record them without error."

a.    Petitioner, Katie Roberts requested the Kansas Secretary of State to address her 2022 election irregularities. In regards to the recount, the response was as follows: **Exhibit V**

- Questioning the effectiveness of post-election audits.
  - The purpose of a post-election audit is to provide Kansans and my office with confirmation of vote results in multiple races in each of Kansas' 105 counties. Cherokee County provided an example during the primary election of a human error taking place, which was discovered due to the post-election audit. At that point, additional steps were taken to verify the vote results.
  - A post-election audit is not intended to recount every ballot. The letter stated that a candidate "was initially declared the winner," but no candidate is declared a winner of an election until the final canvass certifies the results. Until then, all results are unofficial.
  - The oldest election law in Kansas states that administrative errors are not the basis for overturning an election (KSA 25-705, 25-716). Administrative error is not fraud.

- De minimis changes in vote totals after the recount shows tabulator error rates exceed HAVA standards.
  - The underlying assumption forming the premise to the 52 USC 21081(a)(5) argument is inaccurate. The difference between the original certified vote totals and the recount vote totals was "attributable to the voting system," when the difference was actually "attributable to an act of the voter."

  - Voters who complete ballots by hand sometimes mark the ballot in ways that require human review to discern voter intent. The recount board's conclusion as to voter intent is final and, if different, supersedes that of the original counting board.
  - Kansas voting systems are in full compliance with the error rate standards set by HAVA.

b.  This response not only contradicts the law, but asserts the petitioner to be uneducated on the functions of a thumb drive in this particular case, which is 100% not a "human error" but a premeditated script embedded in the thumb drive to tell the machine "what to do" - which in this case was to FLIP VOTES causing a contested election. While the human who unknowingly inserted the thumb drive is not complicit, the manufacturer of the machine should be held accountable for violating the U.S. Constitution for abridging ones vote. This constant rhetoric coming out of the Office of the Kansas Secretary of State by dismissing claims, white washing and gas-lighting the public to believe elections are free and fair, when we can prove they are not. The petitioners implore the Office of the Secretary of State to prove elections are fair and free by offering the Cast Vote Records to be analyzed by a non-partisan statistician for every single county in all elections since 2018.

c.  According to NIST, the Cast Vote Record is a CVR is an electronic record of a voter's selections, with usually one CVR created per sheet (page) of a ballot. Election results are produced by tabulating the collection of CVRs, and audits can be done by comparisons of the paper ballots or paper records of voter selections against the CVRs.

d.  CVR is a simple export that provides valuable data to determine probabilities showing whether system algorithms were used or not based on the timestamp of votes. An expert can analyze the data to determine fraud or not. However, the county clerks and Office of the Kansas Secretary of State is not wanting to release these records.

    i.  Petitioner Melissa Leavitt requested the CVR for Johnson County, but received a fully redacted copy.

    ii.  Petitioner Stacie Harvey requested the CVR for Sedgwick County, but was denied.

    iii.   Petitioner Rosemary Walker requested the CVR for Shawnee County, but was denied.

*Impact of violation of HAVA*

109.    Election results that contain illegal and unlawful votes cannot be certified.

110.    As such, the Defendants' certification of Kansas 2020 presidential election was/is void *ab initio* as the Defendants only have the authority to certify a lawful election.

111.    Since it was unlawful and illegal for the Defendants to certify the 2020 presidential election with the many Kansas county votes using Dominion (15 counties), ES&S (4 counties), Unisyn (29 counties), and Clear Ballot (1 county) voting systems certified during the time that Pro V&V accreditation was lapsed, the Defendants' signatures are void *ab initio*.

112.    *KS 25-4406 (m)* says "**shall** meet the requirements of the help America vote act of 2002 and other federal statutes and regulations governing voting equipment."

    a.  HAVA created EAC

    b.  EAC created testing standards (VVSG), while voluntary for some states, its <u>**required**</u> by Kansas per law to comply

    c.  EAC had a quorum on January 6, 2016 that unanimously voted to fully implement VVSG 1.1 (2015) 18 months from the vote.

    d.  As of July 7, 2017, ALL NEW systems must be tested to the VVSG 1.1.

    e.  As of current day, NO systems, even newly purchased in Johnson & Sedgwick County (known first-hand by Petitioners, but other counties may also have newly purchased systems), are tested to VVSG 1.1.

113.    An election that is void *ab initio* cannot be certified.


### JUSTIFICATION FOR EMERGENCY INJUNCTION - VOTING MACHINES

*While the arguments to this point prove there are major issues violating law and constitutional rights with requested remedies to correct the wrongdoing by de-certification, it is important to identify the root case of the problem in order to ensure our constitutional republic stays strong with correcting our elections. Getting rid of vulnerable electronic voting machines that are susceptible to hacking, third party election rigging, vote flipping and foreign interference is requested for all future elections. Here are many examples from real situations or testimony under penalty of perjury to state our case.*

### *Modems in Electronic Voting Systems*

114.  Election System & Software (ES&S) DS200 with optional modem configuration was marketed to customers as being EAC certified, which is false. Only the DS200 machines *without* modem configuration is EAC certified.

115.  On January 7, 2020, the U.S. Election Assistance Commission (EAC) received a complaint (***Exhibit H***) from two organizations, Free Speech for People and National Election Defense Coalition, stating that:

   a.  ES&S may have violated Sections 5.14 and 5.15.1 of the EAC Testing and Certification Program Manual Version 2.0 by representing or implying that the DS200 with modem configuration is EAC certified when in fact only the DS200 without modem is EAC certified.

   b.  ES&S also may have violated Section 5.16 by failing to warn purchasers that adding a modem to the DS200 will void the EAC certification of the voting system in its entirety.

   c.  "I have reviewed the marketing material submitted by ES&S and confirm that ES&S has several documents that state that the DS200 is "fully certified and compliant with EAC guidelines" while also listing a modem as optional. This misrepresentation is in violation of EAC's Testing and Certification Program." - Jerome Lovato, Director, Voting System Testing and Certification. ***Exhibit I***.

116.  On August 4, 2020, Ed Eilert, Johnson County Commission Chairman, purchased 240 new DS200 election voting machines and 240 tote bins, trading in 240 ExpressVote Tabulators that were purchased in 2018. ***Exhibit J.***

117.     On April 9, 2021, an Analyst by the name of James Thomas Penrose, IV authored a

report titled: "Preliminary Assessment of Wireless Communications Technology for Michigan

Voting Systems" as an exhibit to Bailey v. Antrim County. The Executive Summary states:

***Exhibit K.***

   a.  The ESS Model DS200 was found to have an internal wireless card, that has a private

       network address that was designed to communicate with an ES&S Primary HostServer.

       These devices and servers are ostensibly designed to operate on a virtual private

       network (VPN) that does not allow routing to the Internet. While each of the devices

       do have private network Internet Protocol (IP) addresses, testing revealed that the SIM

       card used for the DS200 could be utilized in a generic device4G wireless device and

       allow for access to the same access point name (APN). There is substantial risk to the

       ES&S APN connected machines from malicious actors that have access to any SIM

       card with pre-programmed access to the APN.

   b.  The manufacturer of the wireless 4G card used in the ES&S DS200 is a company

       named Telit. Telit is an "internet of things" company that has recently taken major

       investment from a Chinese investment fund that has ties to the Chinese Communist

       Party according to UK media reporting.

118.     According to the Secretary of State's office[21]:

   a.  The computer-based voting system should not be connected to any network and it

       should not have a modem. If it does have a modem, it shouldn't be connected to the

       Internet. The computer should have only the operating system and voting software

       loaded. Additional applications could jeopardize system security. If the computer has

---

[21] https://www.sos.ks.gov/elections/19elec/2019-Kansas-Election-Standards-Chapter-VI-Voting-Systems.pdf

no outside connections, it can only be accessed by county election staff or other authorized persons.

b. No data transmission by modem – from polling place to election office or from election office to state. It is important that results from elections not be sent from polling places to election offices via modem, network, phone line, cable, or any other electronic form of file transmission. The same applies when sending results from the county election office to the Secretary of State's office.

119.    Yet, there are Routers in polling locations across Kansas in various polling locations, including e-poll book on Wi-Fi. ***Exhibit L***

120.    The Respondent, Scott Schwab, repeatedly states that he has worked proactively to increase election integrity in Kansas, such as "prohibiting tabulators from being capable of connecting to the internet." Yet, he has **not** banned the use of the D200 tabulator machines that are currently being used in counties across Kansas nor explained why counties such as Johnson County spent $180,000  of donated money from Mark Zuckerberg in October 2020 for "routers" which was only a piece of the $419 million donated for the 2020 Presidential Election - whom is a partisan supporter of Joe Biden, the alleged winner of the election.

**Johnson County Election Office**
**Center for Tech and Civic Life Grant**

| Initial Grant Award | $856,245.00 |
|---|---|
| Unencumbered Funds (as of 3/23/21) | $53,780.15 |

Grant Report Expenditures (1/28/21)

| Vendor | Description | Purpose | Amount |
|---|---|---|---|
| Connected Solutions Group LLC | Cradlepoint Cellular Routers | Connectivity at Election Day polling locations | ($180,320.00) |
| Johnson County Government | Election Worker Stipends | Daily stipends for election workers at new advance voting locations | ($139,732.50) |
| United States Postal Service | Advance Voting Postcard Postage | Additional postcard to promote 10 advance voting locations | ($80,088.77) |
| Inclusion Solutions LLC | BallotCall Max Alert Systems | Curbside voting capability at Election Day polling locations | ($60,838.00) |
| Johnson County Government | Election Worker Stipends | Additional $25 for each election worker on Election Day | ($58,625.00) |
| Regal Plastic Supply Company Inc | Plexiglass Shields | Plexiglass shields to separate voters and election workers | ($34,420.75) |
| Inclusion Solutions LLC | BallotCall Max Alert Systems | Curbside voting capability at Election Day polling locations | ($23,427.30) |
| Election Systems & Software | Ballot-On-Demand Printers | Equipment for additional advance voting locations | ($23,080.00) |
| SeaChange Print Innovations | Advance Voting Postcard Printing | Additional postcard to promote 10 advance voting locations | ($20,710.00) |
| SeaChange Print Innovations | Informational Insert Printing & Packing | Informational insert included with mail ballots for general election | ($18,461.30) |
| SeaChange Print Innovations | Instructional Insert Printing & Packing | Instructional insert included with mail ballots for primary election | ($11,622.13) |
| Johnson County Government | Election Worker Stipends | Additional $25 daily for each member of the election board | ($10,975.00) |
| Oak Park Mall | Advance Voting Location Rental | Additional advance voting location to distance voters | ($10,050.00) |
| Overland Park Convention Center | Advance Voting Location Rental | Additional advance voting location to distance voters | ($9,990.00) |
| Connected Solutions Group LLC | Cradlepoint Cellular Routers | Connectivity at advance voting locations | ($3,752.84) |
| Zoro Tools Inc | Security Carts | Equipment for additional advance voting locations | ($1,971.58) |
| Zoro Tools Inc | Security Carts | Equipment for additional advance voting locations | ($985.79) |
| | | | ($689,050.96) |

Post-Report Adjustments

| Vendor | Description | Reason | Amount |
|---|---|---|---|
| Inclusion Solutions LLC | BallotCall Max Alert Systems | Vendor did not charge the amount quoted for shipping | $558.00 |
| | | | $558.00 |

Extension Report Expenditures

| Vendor | Description | Purpose | Amount |
|---|---|---|---|
| Global Equipment Company Inc | Security Carts | Equipment for transporting supplies to Election Day polling locations | ($91,093.73) |
| The Lock People | Keys and Locks | Locks to secure supply carts sent to Election Day polling locations | ($1,820.20) |
| ULINE | Plastic Totes | Equipment for transporting supplies to Election Day polling locations | ($21,057.96) |
| | | | ($113,971.89) |

### *Kansas and Ohio Elections in 2020 mimic each other - not naturally probable*

121.     The 2020 election analysis has shown probable outcome manipulation through an

algorithm. The below graphic hypothesizes how an outcome can be manipulated in all states,

despite who the winner of that state ended up being.



122.    Edison data trends show improbable patterns, that are also identical in other states. Below, the patterns in Kansas mirror Ohio in the 2020 General Election.  The yellow vertical line represents when Florida's election was called. The purple line represents Edison zero.



123.    A DNP3 Cold Restart was detected on Election Day, 2020. According to Draza Smith,

AKA "Lady Draza" on Telegram (https://t.me/ladydraza), Kansas had TWO hard resets of the

Elvis system on election day that resulted in votes for Trump going DOWN upon restart.



124.    Emails obtained by a KORA request by Shara Collins (Affidavit in **Exhibit M**) shows

emails between the Secretary of State's office and ES&S regarding a cold restart due to a 3rd

party IP address breach during the 2020 presidential election.

### *Malware Attack - Ballot Image Manipulation*

125.    As demonstrated in a video presentation[22] on December 11, 2019 and detailed in a peer

reviewed white paper in **Exhibit N** by Kartikeya Kandula, Jeremy Wink, Matthew Bernhard,

J.Alex Halderman, Department of Electrical Engineering and Computer Science, University of

Michigan,

> "We show that image audits can be reliably defeated by an attacker who can run malicious code
> on the voting machines or election management system. Using computer vision technique, we
> develop an algorithm that automatically and seamlessly manipulates ballot images, moving voter'
> marks so that they appear to be votes for the attacker's preferred candidate. Our implementation is
> compatible with many widely used ballot styles, and we show that it is effective using a large
> corpus of ballot images from a real election. We also show that the attack can be delivered in the
> form of a malicious Windows scanner driver, which we test with a scanner that has been certified
> for the use in vote tabulation by the U.S. Election Assistance Commission."

---

[22] https://www.youtube.com/watch?v=ja6J1wY2UNw

a. The reason this is so dangerous is that due to the lack of transparency in U.S. elections (i.e., a voter cannot cast a vote, then verify who they voted for post-election), diminishing ones vote AFTER the paper ballot becomes a digitized image is essentially undetectable under the guise of "voter secrecy"

b. In a post-election audit, diminished votes would not be detected as malicious vote swapping occurs after a voter inserts their verified ballot into the tabulator.

### *Fraud Built On "Plausible Deniability" & "Human Error"*

126.    Cyber Security experts, such as Jeffrey Lenberg and James Thomas Penrose, IV in a report under the penalty of perjury **(Exhibit O)**, and J Alex Halderman who conducted a report[23] on Antrim County vote flips, both have strong reason to assert that elections can be subverted within the machines themselves.

a. While hacking and remote access can occur, there appears to be a way to defraud an election without anyone knowing, which is called "plausible deniability" - The Ballot or Election Definition Files (BDF or EDF) can be crafted to achieve a certain outcome. A BDF or EDF are definition (of configuration) files that are used to tell the tabulators were to look for ovals on the ballot image (after the ballot has been scanned). BDF's are created by the Election Management System (EMS) and are typically saved to a thumb drive, which is then plugged into a tabulator. The tabulator knows where to check the thumb drive to find the BDF files.

b. A tabulator can run in different modes. It will always produce tallies for all candidates, which will be printed out on the poll tapes. But it can optionally be configured to save

---

[23] https://www.michigan.gov/sos/-/media/Project/Websites/sos/30lawens/Antrim.pdf?rev=fbfe881cdc0043a9bb80b783d1bb5fe9&hash=ACE997FE416108DCBDBC65D56405E5F2

each and every single vote mark it identifies to a file. Each vote mark is associated

with a "candidate ID". The tabulator knows who the candidate is, but is designed to

only save the candidate ID.

c. Once the tabulator finishes counting all the paper ballots, it will save the results back to

the thumb drive. The thumb drive is then "unplugged" and taken to the EMS system

for the votes to be (re)tallied.

d. The EMS will look at the detailed vote mark results files, but instead of using the

tabulator definition files, it will use its own definition files. This means that if the

version of the BDF used on the tabulator is different to the one used by the EMS, the

EMS will allocate votes to the wrong candidate. (i.e. The "candidate ID" definition it

has is different from the tabulator "candidate ID".)

e. The key is in purposefully crafting a mismatch between versions of:

    i. The paper ballot layout and the tabulator election definition files (for certain

    precincts only)

    ii. The tabulator election definition files and the EMS election definition files (for

    certain tabulators only)

    iii. By changing the ballot layout for some precincts and strategically loading

    crafted election definition files into some tabulators, it is possible to engineer a

    desired election outcome.

127.    Over several election cycles more tabulators can be "fixed" to turn a red state purple, then

blue, without anyone noticing. This would explain why election officials claim Kansas

elections are "fair and safe" because the lack of transparency and limited **hand re-counts**

(which catch the known vote maladministration) are the only way to really know. On the flip side, election officials cannot prove to voters their vote was indeed counted as they intended.

128.    The key point is that the tabulators themselves are NOT flipping votes per say. (Even though they have the capability to do that as well, and probably do in some circumstances. But why risk getting caught when there is a "human error" approach that achieves the same outcome?). It is the combination of "version mismatches" that can be crafted to achieve the desired outcome. See the EAC report on Williamson County, TN vote maladministration[24].

### *Thumb Drives - Flip or Maladminister Votes*

129.    An example of the above happened recently in Cherokee County, Kansas.  Cherokee County, Kansas held an election on Tuesday, August 2, 2022.  During a post-election audit pursuant to ***K.S.A. 25-3009*** selected at random, they discovered that the thumb drives used in the election flipped the votes cast for District 1 County Commissioner Myra Frazier and instead gave them to her opponent, Lance Nichols, who was initially declared the winner[25]. Had this county not been selected, the contested race would have never been overturned to the rightful winner, which would have violated the constitutional right of the voters of Cherokee County, Kansas to have their full vote counted. If only one percent of the state's precincts are subject to a post-election audit, one must wonder what other errors are undetected and how election results are affected[26].

130.    This is another example where our current election machines **exceed the maximum acceptable error rate** of one in 500,000 ballot positions, ***HAVA 52-21081(5)***.

---

[24]
https://www.eac.gov/sites/default/files/TestingCertification/EAC_Report_of_Investigation_Dominion_DSuite_5.5_B.pdf
[25] http://cherokeecountyks.gov/main/elected-offices/county-clerk/voting-elections
[26] https://www.fourstateshomepage.com/uncategorized/cherokee-co-audit-found-errors-in-voter-count-program/

### *Foreign Entities In Our Elections - Whistle blower Affidavit (Exhibit Q)*

131.    The person filing the affidavit is over the age of 21 and under no legal disability which

would prevent them from giving this declaration. The election software whistleblower has

extensive experience gathering foreign intelligence in support of operations which took place

within the Continental United States (CONUS) and Outside the Continental United States

(OCONUS). She is a trained Cryptolinguist, holds a completed degree in Molecular and

Cellular Physiology with formal training in other sciences such as Computational Linguistics,

Game Theory, Algorithmic Aspects of Machine Learning, and Predictive Analytics.

Terpesehore Maras possess more than two decades of experience in mathematical modeling

and pattern analysis as well as lesser experience in network tracing and cryptography.

Additionally, she has extensive involvement in overseeing OCONUS elections and the HAVA

Act for CONUS elections. The information presented in the affidavit is a personal, first-hand

account.


132.    Voting Systems rely on foreign made Commercial Off The Shelf (COTS) components

rather than custom components manufactured in the United States. While this presents an

affordable and economic solution to meet the voting demand, it also means these COTS

components introduce vulnerabilities into the Voting Systems. These vulnerabilities can take

the form of proprietary hardware and software, that has not been through vulnerability testing,

manufactured in countries that have strained political and economic relations with the United

States. There are numerous intelligence reports, both US Government and Commercial-

sourced, highlighting the vulnerabilities in hardware and software components manufactured

by foreign countries. (See ***Exhibit Q*** for detailed explanation of COTS)

133.    Two companies in particular are Huawei and Akamai, the latter of which is partnered

with SCYTL which is linked to Software Companies such as Dominion and ES&S. SCYTL

receives the tallied votes on behalf of software companies and, under contract with Associated

Press (AP), provides the results for reporting.  This shows that voting information is under the

control of the companies that provide the Voting Systems.

134.    Scytl is a *foreign* electronic voting machine *software* company that is used in elections

across the nation, including Kansas, for real-time reporting. According to Wikipedia, Scytl

Election Technologies S.L.U. is a *Spanish* provider of electronic voting systems and

electronic technology. Founded in 2001 in Barcelona, its products and services are used in

elections and referenda across the world.

a. **An algorithm redistributes votes in electronic voting machine software, such as

Scytl, ES&S and Dominion**, as witnessed by a private contractor who implemented

operations of elections both CONUS and OCONUS (The continental U.S.; meaning

they worked on election operations both inside the continental U.S and outside). See

*Exhibit Q, sections 44-46*. No one would know this occurred unless they were in

possession of the trapdoor key. The witness says, "Algorithms within the area of this

"shuffling" to maintain anonymity allows for setting values to achieve a desired goal

under the guise of "encryption" in the trap-door. *Exhibit Q, section 38*.

i. The *witnessed* egregiousness of election rigging should raise eyebrows to every

single American and should be properly examined because IF this is happening

under the noses of Americans, IF a small few predetermine the outcome of U.S.

elections using 3rd party vendors to carry out the crime, while undetectable,

then Americans vote truly does not count, violating their right to vote.

135. **Hardware components of electronic voting machines are imported from foreign countries.** MOST of the Commercial Off–The-Shelf (COTS) components used by Election Machine Vendors like Dominion, ES&S, Hart Intercivic, Smartmatic and others is that such manufacturing for COTS have been ***outsourced to China*** which if implemented in our Election Machines make us vulnerable to BLACK BOX antics and backdoors due to hardware changes that can go undetected. ***Exhibit Q; section 22***

    a. **Kansas election votes run through Scytl and Scytl fails Universal Verifiability and Individual Verifiability.**

        i. **Universal verifiability** means votes cast are the votes counted and integrity of the vote is verifiable (the vote was tallied for the candidate selected) because "no mathematical proofs can determine if any votes have been manipulated" with the correct trapdoor "Scytl or anyone that knows the commitment parameters can take all the votes and give them to anyone they want." Verifiability means "the fact of being able to be proved to be true or correct" ***Exhibit Q; section 41***

        ii. **Individual verifiability:** A voter cannot verify if their ballot got correctly counted. Like, if they cast a vote for ABC they want to verify it was ABC. That notion clearly discounts the need for anonymity in the first place. ***Exhibit Q; section 42***

136. According to Scytl's website, their service includes ***Real-time***, automated election results delivery: Distribute report requests through an automated delivery system managed through a recipient list[27].

---

[27] https://scytl.us/products/election-night-reporting/

a.  The Petitioners would like an explanation on how results can be real-time if data transmission by modem or internet is NOT allowed according to the Secretary of State's office[28]:

    i.  The computer-based voting system should not be connected to any network and it should not have a modem. If it does have a modem, it shouldn't be connected to the Internet. The computer should have only the operating system and voting software loaded. Additional applications could jeopardize system security. If the computer has no outside connections, it can only be accessed by county election staff or other authorized persons.

    ii.  No data transmission by modem – from polling place to election office or from election office to state. It is important that results from elections not be sent from polling places to election offices via modem, network, phone line, cable, or any other electronic form of file transmission. The same applies when sending results from the county election office to the Secretary of State's office.

### *Electronic Voting Machines Can be Hacked - IT Elections Security Expert Testimony*

137.  On July 21, 2022, an Information Technology and Elections Security expert gave testimony in the hearing of case 2:22-cv-00677, *Lake v. Hobbs*, in the District Court of Arizona, which revealed many critical security vulnerabilities[29]. According to the Gateway Pundit, this testimony, given under oath by Clay Parikh, changes everything. In a 20-minute testimony with two attorneys on the cross-examination and a redirect, Clay Parikh revealed that the testing labs:

---

[28] https://www.sos.ks.gov/elections/19elec/2019-Kansas-Election-Standards-Chapter-VI-Voting-Systems.pdf
[29] https://www.thegatewaypundit.com/2022/07/elections-assistance-commission-aware-machines-hacked-minutes/

- Restrict testers from showing vulnerabilities
- Stop testers from going further into the machines in a way that could allow for software manipulation of the statistical data.
- The EAC has been sent reports of all of Parikh's hackings, which took minutes, and were done in a professional testing environment.
- The voting machines can connect to the internet and that even the ones that aren't connected still have open ports and means by which to connect.
- Dominion rewrote their Democracy Suite software in 2018

138.    According to an article published January 10, 2020 by NBC News[30]:

"The three largest voting manufacturing companies — Election Systems & Software, Dominion Voting Systems and Hart InterCivic — have acknowledged they all put modems in some of their tabulators and scanners. The reason? So that unofficial election results can more quickly be relayed to the public. Those modems connect to cell phone networks, which, in turn, are connected to the internet.

The largest manufacturer of voting machines, ES&S, told NBC News their systems are protected by firewalls and are not on the "public internet." But both Skoglund and Andrew Appel, a Princeton computer science professor and expert on elections, said such firewalls can and have been breached.

For election systems to be online, even momentarily, presents a serious problem, according to Appel.

"Once a hacker starts talking to the voting machine through the modem, the hacker cannot just change these unofficial election results, they can hack the software in the voting machine and make it cheat in future elections," he said.

The National Institute of Standards and Technology, which provides cybersecurity frameworks for state and local governments and other organizations, recommends that voting systems should not have wireless network connections.

Skoglund said that they identified only one company among the systems they detected on line, ES&S. ES&S confirmed they had sold scanners with wireless modems to at least 11 states. Skoglund says those include the battleground states of Michigan, Wisconsin and Florida.

---

[30] https://www.nbcnews.com/politics/elections/online-vulnerable-experts-find-nearly-three-dozen-u-s-voting-n1112436

While the company's website states that "zero" of its voting tabulators are connected to the internet, ES&S told NBC News 14,000 of their DS200 tabulators with online modems are currently in use around the country."

### Votes Can Be Fractionalized

139.    **Votes are fractionalized in the software that "abridge" a vote from counting fully.**

In 2003, Bev Harris, author and founder of BlackBoxVoting.org, came across 40k voting machine files that contained the secret files called GEMS for the central tabulator that ultimately controls what goes in and out of every voting machine. In 2016, she shared these files with Bennie Smith, a Memphis programmer, currently appointed as the commissioner of Shelby County Elections, demonstrated how easy it was to fractionalize votes. He discovered that votes were being counted as money, with 2 decimal places (but hidden and unseen by the naked eye) in the master computer, therefore affecting an election. These claims are serious - democracy is not a vote by the people, but an illusion of democracy with chosen leaders by those who created such vulnerabilities. Bennie conducted a demonstration on how a simple thumb drive, remote access or hack could successfully alter votes in less than 20 seconds. See *Exhibit R* to watch Bennie conduct the demonstration.

## VIOLATIONS

### 25-4603. Certification by the Secretary of State

140.    *K.S.A. 25-4603.* Same; secretary of state to approve kinds and makes of systems; certification for use. The secretary of state **shall** examine and approve the kinds or makes of systems using optical scanning equipment, including operating systems, firmware and software, and no kind or make of such system shall be used at any election unless and until it

receives certification by the secretary of state and a statement thereof is filed in the office of the secretary of state.

    a. On December 13, 2021, Scott Schwab, granted certification of ES&S EVS 6.1.1.0, tested to the VVSG 1.0 testing standard by EAC.

### K.S.A. 25-3009. Post Election Audit Violations  - Affidavit by Thad Snider (Exhibit A)

141.     **K.S.A. 25-3009.** Postelection audit of votes cast; procedure; bipartisan board; selection of board members and of races for audit; notice; reports; use of results; additional audits; adoption of rules and regulations by secretary of state; effective date. (a) After an election and prior to the meeting of the county board of canvassers to certify the official election results for any election in which the canvassers certify the results, the county election officer shall conduct a manual audit or tally of each vote cast, regardless of the method of voting, in 1% of all precincts, with a minimum of one precinct located within the county. The precinct or precincts shall be randomly selected and the selection shall take place after the election.

    a. (b) (1) The audit shall be performed manually and shall review all paper ballots selected pursuant to subsection (a). The audit shall be performed by a sworn election board consisting of bipartisan trained board members. The county election officer will determine the members of the sworn election board who will conduct the audit.

142.     The Post Election Audit that Petitioner, Thad Snider was witness of, actually used the photocopies of the digital images of the ballots in lieu of the Voter-Verified Paper Audit Trail (VVPAT) ballots produced by the Ballot-Marking Devices (BMDs) on which the voters are instructed to inspect and confirm their choices of candidate prior to casting their votes in the tabulator.

a. 25-4406. Same; mandatory requirements for electronic or electromechanical systems approved. Electronic or electromechanical voting systems approved by the secretary of state:

    i. (k) shall provide a paper record of each vote cast, produced at the time the vote is cast;

    ii. (l) shall have the ability to be tested both before an election and prior to the date of canvass. The test shall include the ability to match the paper records of such machines to the vote totals contained in the machines; and

    iii. (m) shall meet the requirements of the help America vote act of 2002 and other federal statutes and regulations governing voting equipment.

b. Thad concluded "As someone who swore an Oath to uphold the Constitution, he found this process to be unconstitutional and does not consent to the final result, despite Scott Schwab's bold statements that "Kansas has been recognized as a leading state in the nation for its election integrity..." yet he has no intention to investigate the facts presented to him prior to filing this verified petition, which is a direct consequence of his inaction.

### *K.S.A. 25-4406(m). Voting Equipment fails to meet HAVA*

143. ***K.S.A. 25-4406(m).*** Electronic or electromechanical voting systems approved by the secretary of state: "**shall** meet the requirements of the help America vote act of 2002 and other federal statutes and regulations governing voting equipment." ***HAVA 52-21085(5)*** requires that the maximum acceptable error rate is 1 in 500,000.

a. The Value Them Both amendment recount had an average error rate of 1 in 3,785.

    b.  Cherokee County, Kansas post-election audit discovered that the thumb drives used in the election flipped the votes cast for District 1 County Commissioner.

    c.  Both are examples where the voting system did not comply with HAVA requirements.

### *K.S.A. 25-4414. Electronic Voting Machines Purchased Are Illegal*

144.    Specifications[31] for optical scanning systems and equipment. (i) **shall** meet the requirements of the help America vote act of 2002 and other federal statutes and regulations governing voting equipment. The acquisition, possession and use of un-certified electromechanical and electronic voting systems is a felony under ***K.S.A. 25-4414***: Electronic or electromechanical voting system fraud; penalty. Electronic or electromechanical voting system fraud is:

    a.  (a) Being in unlawful or unauthorized possession of voting equipment, computer programs, operating systems, firmware, software or ballots; or

    b.  (b) intentionally tampering with, altering, disarranging, defacing, impairing or destroying any electronic or electromechanical system or component part thereof, or any ballot used by such systems.

145.    Electronic or electromechanical voting system fraud is a severity level 9, nonperson felony. ***K.S.A. 25-4414.***

146.    Johnson County, Kansas, (and some others such as Jackson county[i]) purchased new voting equipment on August 7, 2018 (***Exhibit T***) and August 4, 2020 (***Exhibit J***), which neither purchased were of machines that are fully certified according to HAVA to the current VVSG 1.1 standard.

---

[31] https://www.ksrevisor.org/statutes/chapters/ch25/025_044_0014.html

147.    According to the EAC, as of July 6, 2017, any new voting systems and any modifications

to existing voting systems that require re-certification, must be certified to VVSG 1.1.

148.    Any existing systems that do NOT have modifications and have an existing certification

to VVSG 1.0 are not affected by the sunset of VVSG 1.0[32].

### K.S.A. 25-1122(g). Allowing the use of Illegal Drop Box sites

149.    ***K.S.A. 25-1122(g).*** *Advance voting; ballot application identification requirements;*

*provisional ballots; time for filing application; satellite advance voting sites; voters needing*

*assistance; permanent advance voting status; records maintained by county election officer;*

*restrictions on mail ballot applications; unlawful acts and penalties; rules and regulations.*

"The county election officer may designate places other than the central county election office

as satellite advance voting sites. **At any satellite advance voting site**, a registered voter may

obtain an application for advance voting ballots…"

150.    An outdoor drop box location cannot meet the requirements of a satellite advance voting

site because the voter cannot obtain an application for advance voting ballots at a Dropbox.

151.    Because of the Wisconsin forensic audit, on July 8, 2022, the Wisconsin Supreme Court

ruled the ***ballot drop boxes illegal***[33]. The state's high court ruled that voters themselves must

return absentee ballots and cannot use drop boxes. Justice Rebecca Bradley wrote for the

majority stating, "the key phrase is 'in person' and it must be assigned its natural meaning."

Additionally, the leader of the Wisconsin Assembly's elections committee called Friday, July

22, 2022, for invalidating President Biden's 2020 election victory in the state[34]. "Fair and

honest elections are the cornerstone of our democracy and we know that the 2020 presidential

---

[32] https://www.eac.gov/documents/2016/09/07/1616-eac-public-meeting-minutesdoc
[33] https://www.washingtonpost.com/politics/2022/07/08/wisconsin-ballot-drop-boxes/
[34] https://www.washingtonpost.com/politics/2022/07/22/wisconsin-2020-results/

election was neither fair, nor transparent," state Rep. Janel Brandtjen (R) said in a news release. "Tyranny is at Wisconsin's door."

152.    According to **K.S.A. 25-1128**. *Advance voting; return of ballots to county election officer; procedures for voters needing assistance; unlawful acts and penalties*.

"If the advance voting ballot was **transmitted by mail**, the voter personally **shall** place the ballot in the ballot envelope bearing the same number as the ballot and seal the envelope. The voter shall complete the form on the ballot envelope and shall sign the same. Except as provided by K.S.A. 25-2908, and amendments thereto, the **ballot envelope shall be mailed or otherwise transmitted to the county election officer**. If the advance voting ballot was transmitted to the voter **in person in the office** of the county election officer or at a satellite advance voting site, the voter may deposit such ballot into a locked ballot box without an envelope."

153.    The Kansas Legislature made a provision for two types of advance voting. One is by mail, where the ballot is mailed to the voter and the voter mails the ballot back to the county election officer or transmit the ballot to the county election officer (not an outdoor drop box). The second is in-person, where a voter goes to the county elections office OR a satellite advance voting site to pick up their ballot and turn-in their completed ballot at the same time. There is no provision for obtaining a ballot by mail and turning it in to an outside drop box.

   a.    Advanced Voting and Mail in Ballots are allowed in the Kansas Constitution, however drop boxes are illegal in Kansas, yet various counties have several[35].

   b.    Drop box chain of custody cannot be verified. For the 2021 general election in Johnson County, a fulfilled KORA request revealed that out of the 113 drop box ballot transfer forms, NONE had the necessary four signatures that Respondent, Bryan Caskey, State

---

[35] Johnson County Drop box locations — https://jocoelection.org/location-type/ballot-drop-box-locations
Sedgwick County Drop box locations — https://www.sedgwickcounty.org/elections/ballot-drop-boxes/

Elections Director, said were required for a valid chain of custody. According to him one Republican and one Democrat should be on the retrieving and receiving end of ballot transfer.  As such, 6,694 ballots in the 2021 General Election in Johnson County had no proper chain of custody. This issue was made known to all parties prior to certification and they certified that election despite the fact this was enough to be determinative in most, if not all, outcomes in that election.

### Timing of the General Election

154. Voting AND counting of votes in Kansas should be one day only. The ***Kansas Constitution Article 4 § 2*** states:

    a. **"General elections.** General elections **shall** be held biennially **on** the Tuesday succeeding the first Monday in November in even-numbered years. Not less than three county commissioners shall be elected in each organized county in the state, as provided by law."

    b. "All laws which are repugnant to the Constitution are null and void." *Marbury vs. Madison*, 5 US (2 Cranch) 137, 174, 176, (1803).

    c. "Where rights secured by the Constitution are involved, there can be no rule making or legislation which would abrogate them." *Miranda vs. Arizona*, 384 US 436 p. 491.

        i. The Kansas Constitution limits voting in a general election to a single day.

        ii. For the 2022 election, counties may begin in-person advanced voting on October 19 for the general election. The deadline for in-person advance voting is 12:00 p.m. November 7, 2022 for the general election.[36]

---

[36] https://sos.ks.gov/elections/voter-information.html

### *Oath of Office Violations - To Defend the Constitution*

155.   As proven in this complaint, maladministered votes are often undetected, unless a hand

recount is conducted with the Voter-Verified Paper Audit Trail (VVPAT) ballot. A very tiny

percent of precincts in the whole state of Kansas are subject to this type of scrutiny and is

more or less a check box to fulfill a statute - not a genuine act to ensure votes are counted as

intended.

156.   Scott Schwab, Secretary of State, representing Kansas attended the National Association

of Secretaries of State (NASS) in August 2021, with other Secretary of States across the nation.

As a result of the meeting, Schwab signed an agreement to NOT pursue a full forensic audit

(like Maricopa County) for Kansas claiming that unless a judge orders the 2020 election

results to be unsealed, the election is done and no additional audits will be conducted, despite

public outcries for a thorough investigation to fix deficiencies in our local elections.  ***Exhibit***

***U***

    a.   The Kansas Secretary of State, and the Kansas Attorney General (who have been given

much of this information) have ***not*** been supportive of investigating evidence of clear

law violations and lack of certified voting equipment. Instead, they deny election

issues and continue to claim "fair and safe" elections while dodging the citizen's

concerns.

    b.   On September 20th, 2019, the Office of the Attorney General of Kansas and the Office

of the Kansas Secretary of State entered a Memorandum of Agreement regarding

identifying and prosecuting election crimes.

## CONCLUSION

*"Measure a man's worth by his actions alone. For the devil also promises the moon." –*

*Avijeet Das*

Simply '*saying*' the elections are fair, free of fraud and transparent is not the same as '*proving*'

they are indeed as you say. The vast amount of verified proof that contradicts the Secretary of

States opinion of Kansas elections puts in question his integrity and ability to serve Kansas, as

promised when he took an oath to protect the very constitution his own office has violated.  If

people lose confidence in elections due to lack of transparency, elected officials' unwillingness

to investigate suspicions by the people they represent and prove their suspicions to be

unsubstantiated, then we are in danger of losing our Constitutional Republic of the United States

- the land of the free.


## PLAINTIFF(S) FACE DIFFICULT CIRCUMSTANCES

The Kansas Secretary of State fraudulently allowed the people of Kansas to vote on

machines that were not certified in all elections beyond July 6, 2017. Thereby rendering the

results void.

The Respondents continued to certify election results knowingly violated the civil

liberties of Kansans  subsequently entering the Plaintiff into a fraudulent contract with

government officials.

Each day, Petitioners suffer irreparable harm as the Petitioners live under a government

that no longer represents them and deprives them of a republic form of government that the

State of Kansas and United States Constitution provides as protection from a tyrannical

government. It is the Petitioner's constitutional duty to invoke their authority as a free person to petition and address this to the court regardless of the outcome of this complaint, it serves as notice to all acting officials and non-officials within our government that the Petitioners demand justice for any criminal behavior and fraud.

"No state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it." The constitutional theory is that we the people are the sovereigns, the state and federal officials only our agents. Cooper v. Aaron, 358 U.S. 1, 78 S. Ct. 1401 (1958). To allow us to vote in another election conducted on uncertified machines is a violation of our 1st and 14th amendment rights and in violation of R.S. 18:2, R.S. 18:18, R.S. 18:572, R.S. 1351, Chapter 8, R.S. 18:1361, RS 18:1366, RS 18:1374. "We the People" stand to lose more of our freedoms as each day passes without resolution.

## PRAYER FOR RELIEF

WHEREFORE, for these facts alone, the premises considered, Petitioners pray as follows:

1. Petitioners respectfully requests the Court order that the Respondents be cited to appear herein and, upon final hearing, that this Court sustain these elections and enter a final judgment directing Governor Kelly to render elections void no later than 10 days after the date of judgment becomes final as "fraud vitiates everything,". *United States v. Thorckmorton*, 98 U. S. 61.

2. Petitioners respectfully requests the Court issue a peremptory Writ of Mandamus compelling the Kansas Secretary of State, Governor, and Attorney General to de-certify the Kansas 2020 general election and order the Secretary of State to re-run the Kansas 2020 presidential election, in accordance with the law, as soon as possible, by way of a special election, with paper ballots only, on a single election day, with the paper ballots being counted by hand, with multiple members of all political parties present to observe, with unobstructed 24/7 public live-stream cameras of all vote counting so that Kansas can restore voter confidence and Kansas' commitment to free and fair elections, with ordering the Respondents to then certify a lawful 2020 general election;

3. Petitioners respectfully requests the Court to grant an emergency injunction that none of the data and information of the voting systems and equipment from the 2020 general elections forward be tampered with, nor deleted;

4. Petitioners respectfully requests the Court to compel the Attorney General Derek Schmidt's office to issue a referral of a complaint under 52 U.S. Code §20511(2)(b) for Scott Schwab and to open an investigation of criminal and fraudulent election violations and allegations henceforth provided in this complaint with the full authority of 52 U.S. Code §20511(2)(b) including but not limited to the impounding of election materials and electronic voting system;

5. Petitioners respectfully requests the Court to grant an emergency injunction that none of the unapproved electronic voting machines in the state be used for another election and the electromechanical and electronic voting system be replaced with paper ballots in the interim;

6. Petitioners respectfully request the Court to order election day be one day, with all eligible votes only be allowed to count on election day. No vote or ballot shall be accepted and counted beyond election day;

7. Petitioners respectfully request the Court to order elimination of drop boxes that are not polling places as defined by statute; and

8. Grant such other and further relief the Court sees just, equitable, and proper.

Respectfully submitted this 15th day of September, 2022.

By: _Katie Roberts_
Katie Roberts
15730 S. Lone Elm Rd.
Olathe, KS 66061
kroberts102684@gmail.com
913-963-5723

By: _Rosemary Walker_
Rosemary Walker
3150 SW Westover Rd.
Topeka, KS 66604
rwalker2203@gmail.com
785-783-0012

By: _Melissa Leavitt_
Melissa Leavitt
535 West 8th St.
Colby, KS 67701
Missy.Leavitt@protonmail.com
785-443-0634

By: _Thatson_
9712 Pickering St
Lenexa, KS 66227
WeThePeopleKS@ProtonMail.com
913-265-6480

By: _Stacie Harvey_
Stacie Harvey
1834 N. Denis Marie St.
Wichita, KS 67212
Stacie.Harvey@gmail.com
316-644-4851

By: _Hannah Mingucci_
Hannah Mingucci
1300 E. Sleepy Hollow Drive
Olathe, KS 66062
Hannah.Mingucci@gmail.com
913-626-4795

## DOCUMENTARY EVIDENCE

| Name of Document | Exhibit |
|---|---|
| Affidavit of Thad Snider, 2022 Post Election Audit | A |
| Stacie's denied KORA for caste vote record | B |
| EAC Meeting Minutes on 1-1-16 implementing VVSG 1.1 by July 6, 2017 | C |
| EAC Director & Certification Specialist Presentation dated April 2017. | D |
| GAO Audit April 2018 | E |
| All SOS voting machine certifications on file via KORA | F |
| Affidavit of Rosemary Walker, VTB stats, error rate | G |
| Request to investigate ES&S for misrepresentations regarding EAC certification of voting machines with modems | H |
| EAC email exchange re: complaint of D200 misrepresentation | I |
| Johnson County Purchase of DS200 machines 2020 | J |
| James Thomas Penrose, IV authored a report titled: "Preliminary Assessment of Wireless Communications Technology for Michigan Voting Systems | K |
| Wi-Fi Screen Shot for PollPad | L |
| Affidavit by Shara Collins regarding emails of the cold restart on election day (an other election related issues) | M |
| White Paper on Automated Ballot Image Manipulation | N |
| Antrim County Affidavit Report evidencing vote manipulation | O |
| Scott Schwab Memo to KS Legislature 2020 re: Dominion 'Disinformation' | P |
| Terpesehore Maras: Affidavit of Government Contractor specializing in election operations | Q |
| You tube Video: Fraction Magic - Detailed Vote Rigging Demonstration: https://www.youtube.com/watch?v=Fob-AGgZn44 | R |
| Johnson County machines purchase in 2018 | T |
| NASS Task Force on Post Election Audits | U |
| SOS Letter in response to Petitioner, Katie Roberts' email re election integrity concerns | V |

# VERIFIED PETITION OF MANDAMUS

*(see the following verified petition for each Petitioner)*

STATE OF KANSAS

COUNTY OF JOHNSON

I have read the foregoing factual allegations contained in this Verified Writ of Mandamus and do hereby certify that they are true and correct to the best of my knowledge.

Katie Roberts
Petitioner

SWORN TO AND SUBSCRIBED before me on this 15 day of September 2022

Signature

(Seal)

NOTARY PUBLIC

My Commission expires 04/24/2023

MEAGAN FLEMING
Notary Public-State of Kansas
My Appt. Expires 04/24/2023

## VERIFIED PETITION OF MANDAMUS

STATE OF KANSAS

COUNTY OF   SHAWNEE

I have read the foregoing factual allegations contained in this Verified Writ of Mandamus and do hereby certify that they are true and correct to the best of my knowledge.

*Rosemary Walker*

Rosemary Walker
Petitioner
3150 SW Westover Rd
Topeka, KS 66604
785-783-0012
rwalker2203@gmail.com

SWORN TO AND SUBSCRIBED before me on this __15__ day of _Thursday_, 2022

Signature _____
(Seal)
NOTARY PUBLIC
My Commission expires:

NOTARY PUBLIC
STATE OF KANSAS
BERNADETTE LINCHANGCO
My Appointment Expires: 7-13-25

## VERIFIED PETITION OF MANDAMUS

STATE OF KANSAS

COUNTY OF _Johnson_

I have read the foregoing factual allegations contained in this Verified Writ of Mandamus and do hereby certify that they are true and correct to the best of my knowledge.

Signature: _Thad Snider_

Name: _Thad Snider_
Petitioner

SWORN TO AND SUBSCRIBED before me on this _15_ day of _September_ 2022

Signature _Victoria L Kline_

(Seal)

NOTARY PUBLIC

My Commission expires:

_September 27, 20 25_

NOTARY PUBLIC
Victoria L Kline
My Appt. Expires
STATE OF KAN

## VERIFIED PETITION OF MANDAMUS

STATE OF KANSAS

COUNTY OF _Thomas_

I have read the foregoing factual allegations contained in this Verified Writ of Mandamus and do hereby certify that they are true and correct to the best of my knowledge.

Signature: _Melissa Leavitt_

Name: _Melissa Leavitt_

Petitioner

SWORN TO AND SUBSCRIBED before me on this _15_ day of _Sept_, 2022

Signature _Caroline Ginther_

(Seal)

NOTARY PUBLIC

My Commission expires:

NOTARY PUBLIC - State of Kansas
CAROLINE GINTHER
My Appt Expires _1-5-23_

## VERIFIED PETITION OF MANDAMUS

STATE OF KANSAS

COUNTY OF *Johnson*

I have read the foregoing factual allegations contained in this Verified Writ of Mandamus and do hereby certify that they are true and correct to the best of my knowledge.

Signature: _____

Name: _9 / 15 / 22_
                                           Petitioner

SWORN TO AND SUBSCRIBED before me on this _15_ day of _Sept_, 2022

Signature _L Kelly_
(Seal)
NOTARY PUBLIC
My Commission expires: _4|15|2026_

LAKIA KELLY
Notary Public - State of Kansas
My Appointment Expires 4/15/2026