## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

KATIE ROBERTS; ROSEMARY
WALKER; THAD SNIDER; STACIE
HARVEY; HANNAH MINGUCCI; and
MELISSA LEAVITT,
*Plaintiffs,*

vs.

BYRAN CASKEY, in his official capacity
as Director of Elections; SCOTT
SCHWAB, in his official capacity as
Kansas Secretary of State; DEREK
SCHMIDT, in his official capacity as
Attorney General of the State of Kansas;
and LAURA KELLY, in her official
capacity as Governor of the State of Kansas,

*Defendants.*

Case No.: 2:22-cv-2366-DDC-ADM

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
## FOR A TEMPORARY RESTRAINING ORDER

Defendants Bryan Caskey, Scott Schwab, Derek Schmidt, and Laura Kelly, each sued in their official capacities and acting through their undersigned counsel, respectfully submit this Response to Plaintiffs' Motion for an Emergency Temporary Restraining Order (Dkt. 14). As set forth below, Plaintiffs' motion must be denied because the Court lacks subject matter jurisdiction over this dispute and, in any event, Plaintiffs are unable to meet the requirements for obtaining a temporary restraining order ("TRO").

## I.      Introduction

In less than one month, voters across Kansas will gather to cast ballots for various federal and state offices. In preparation for that election, most counties have already developed plans on how votes will be cast, determined the requisite supplies for polling locations, determined how

advance mail ballots will be received and processed, and communicated their plans with voters. Now, on the eve of this election, with early voting slated to begin in a matter of days, Plaintiffs seek to upend this carefully prepared framework by demanding entirely new procedures that are wholly at odds with both federal and state law, that would undermine the structure established by counties across Kansas for conducting the election, that would upset the expectations of voters and election officials alike, and that would introduce mass chaos into the electorate.

Although Plaintiffs' rambling Petition focuses on various aspects of election administration and effectively seeks to nullify all elections between 2017 and 2022, Pet. ¶ 95(a), the motion for a TRO before the Court seeks "only" to bar the use of electronic voting machines and drop boxes for the upcoming General Election.  Aside from the total lack of merit in Plaintiffs' conspiracy-laden allegations, there are myriad jurisdictional hurdles that prevent this Court from affording Plaintiffs any of the relief they seek:  none of the Plaintiffs has standing, the State officials who have been sued all enjoy Eleventh Amendment immunity because the allegations against them are rooted in state (not federal) law, the one federal law indirectly referenced – the Help America Vote Act ("HAVA") – provides no private right of action, and the only individuals with authority to decide whether or not to employ electronic voting machines and drop boxes in an election are *county* election officials, none of whom are parties to this case.

Moreover, even if one were to briefly suspend reality and somehow breathe legitimacy into the Plaintiffs' baseless allegations, the TRO request comes far too late in the day for this Court to order any relief.  The factual predicate for Plaintiffs' attack on the certification and deployment of electronic voting machines goes back *five years*.  Drop boxes, meanwhile, have been used in many counties throughout the State (including Johnson County) for *decades*, and nearly all counties in the State for at least *two years*.  Plaintiffs' dilatory pursuit of their legal challenge undermines any

suggestion of an emergency.  The Supreme Court has likewise made it abundantly clear that, irrespective of the merits, federal courts generally must stay their hands when invited to interfere with the mechanics of a state-run election with voting imminent.  In short, there is no basis for granting Plaintiffs a TRO.

## II.  <u>Applicable Legal Standards</u>

A Court applies the same standard to a motion for a temporary restraining order as it does for a preliminary injunction.  *Rangel-Lopez v. Cox*, 344 F. Supp.3d 1285, 1289 (D. Kan. 2018). "A preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the movant is entitled to such relief." *N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1245-46 (10th Cir. 2017) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)) (internal quotation marks omitted).  This well-established standard requires that the movant meet four separate factors:  (1) it is substantially likely to succeed on the merits; (2) it will suffer irreparable injury if the injunction is denied; (3) its threatened injury outweighs the injury that the opposing party will suffer under the injunction; and (4) the injunction will not be adverse to the public interest.  *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016). Because this remedy is so extraordinary, it will only be awarded if the movant's right to relief is clear and unequivocal.  *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016).

Further, certain preliminary injunctions are disfavored and thus require an even stronger showing by the movant.  *Fish*, 840 F.3d at 723.  These include (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits. *Id.* at 723-24.  In light of Plaintiffs' requested relief here – that the Court modify the status quo of

3

how counties will administer the upcoming Kansas election – this case falls squarely into all three of these categories, thereby heightening Plaintiffs' burden.  *See O Centro Espirita Beneficientre Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975-76 (10th Cir. 2004) (en banc).

## III.  **Argument**

### A.  – *This Court Cannot Grant a Writ of Mandamus Against State Officials.*

As a preliminary matter, although Plaintiffs' TRO motion does not mention the term "writ of mandamus," the relief Plaintiffs seek in their Petition – which is ultimately the basis for the TRO motion – is a writ of mandamus against the Defendants.  Dkt. 1 at 1.  The Court has no authority to grant such a writ in this case.  "The only federal statute concerning the federal district court's authority to issue writs of mandamus is 28 U.S.C. § 1361." *Schwarzer v. Shanklin,* 2019 WL 1150756, at *3 (E.D. Tex. Mar. 13, 2019).  Per that statute, "district courts shall have original jurisdiction of any action in the nature of mandamus to compel *an officer or employee of the United States or any agency thereof* to perform a duty owned to the plaintiff."  28 U.S.C. § 1361 (emphasis added).  But a federal district court is without jurisdiction under section 1361 to compel *state officials* to perform any duty owned to a plaintiff under state law.  *Stevens v. Sheriff of El Paso Cnty., Colo.*, 15 F. App'x 740, 742 (10th Cir. 2001).  Defendants – all State officials – are thus not subject to this Court's mandamus authority.  *Rivers v. King*, 23 F. App'x 905, 908 n. 4 (10th Cir. 2001).

### B.  – *Plaintiffs Lack Standing*

Before the Court can reach the merits of the requested TRO, it must first evaluate Plaintiffs' standing to bring this case.  *Cole v. Goossen*, 402 F. Supp.3d 992, 1002 (D. Kan. 2019).  Whether a plaintiff has standing to maintain a lawsuit is an element of subject matter jurisdiction.  *Peck v. McCann*, 43 F.3d 1116, 1124 (10th Cir. 2022).  As the party invoking the Court's jurisdiction, the

burden is on Plaintiffs to demonstrate they have standing to bring their lawsuit.  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207-08 (2021).

Article III of the Constitution limits federal judicial power to the resolution of "Cases" and "Controversies."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  In simple terms, a plaintiff must be able to show a personal stake in the matter that warrants invoking the judiciary's authority.  *Raines v. Byrd*, 521 U.S. 811, 819 (1997).  The "'irreducible constitutional minimum' of standing consists of three elements."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted).  Specifically, a plaintiff must show that (1) he suffered an injury in fact, (2) the injury is fairly traceable to the challenged conduct of the defendant, and (3) the injury is likely to be redressed by a favorable judicial decision."  *Id*.

With regard to the first element, a plaintiff must prove the "invasion of a legally protected interest which is concrete and particularized, and actual or imminent, not conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  "Particularized" injuries are those that affect a plaintiff in "a personal and individual way."  *Spokeo*, 578 U.S. at 339.  While a showing of particularization is necessary to establish an injury in fact, it is not sufficient.  *Id*.  An injury must also be "concrete," meaning it must be "real" and not "abstract."  *Id*.

Plaintiffs have alleged no facts showing how the use of electronic voting machines or drop boxes affects them *personally* and *individually*.  Instead, they assert generalized grievances that are "plainly undifferentiated and common to all members of the public."  *Lujan*, 504 U.S. at 575 (citing *United States v. Richardson*, 418 U.S. 166, 176-77 (1974)).  Nothing in the allegations is particularized to Plaintiffs.  The law is well settled that a plaintiff has no standing to seek redress for a generalized grievance that "no more directly and tangibly benefits him than it does the public at large."  *Id.* at 573-74.

Moreover, a subjective apprehension of what may have happened or will happen is insufficient for standing. *See Finstuen v. Crutcher,* 496 F.3d 1139, 1144 (10th Cir. 2007). "In a plea for injunctive relief, a plaintiff cannot maintain standing by asserting an injury based merely on 'subjective apprehensions' that the defendant might act unlawfully." *Id.* (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983)).

**1. Plaintiffs' Petition asserts nothing more than generalized grievances, not a particularized injury in fact.**

Plaintiffs' TRO motion is predicated on nothing more than generalized and unsupported fears of vulnerabilities in the State's electronic voting machines. Plaintiffs theorize that, because the machines are not certified up to the standards that Plaintiffs think should be imposed, there could be errors in the tabulation of votes and the accuracy of electoral outcomes could be at risk. Even if that was true, and it is categorically not, such abstract and non-particularized allegations would not suffice to confer subject matter jurisdiction on the Court.

"A person's right to vote is individual and personal in nature, and voters must allege facts showing disadvantage to themselves as individuals to have standing to sue." *Iowa Voter Alliance v. Black Hawk Cnty.*, 515 F. Supp.3d 980, 990 (N.D. Iowa 2021). Generalized claims suggesting that the integrity of an election has been compromised are insufficient to establish a particularized harm. *See id.* ("While maintaining the integrity of elections is fundamental to a functioning democratic system and is a compelling government interest, the injury plaintiffs claim is abstract and not particularized to them."). In *Iowa Voter Alliance*, the plaintiffs argued that the counties' use of private, third-party grants to fund an election "burdened their right to vote by compromising the integrity of the election." *Id.* They failed to allege, however, how their individual ability to cast a vote and have it counted was burdened. *Id.* That omission, the Court held, was fatal to their standing. *Id.*; *see also Stein v. Cortés*, 223 F. Supp.3d 423, 432 (E.D. Pa. 2016) (finding plaintiff

"has not alleged that his vote was inaccurately recorded or tallied in the final Pennsylvania vote count" and his "allegation that voting machines may be 'hackable,' and the seemingly rhetorical question they pose respecting the accuracy of the vote count, simply do not constitute injury-in-fact.").

So, too, here. Plaintiffs do not identify how their individual ability to cast a vote and have it counted is burdened by electronic voting machines and drop-boxes. Their TRO request is a bare-bones, three-paragraph motion that provides no explanation as to how any of them have suffered a personal injury. Likewise, the Petition amounts to nothing more than a hodge-podge mini treatise of *potential* issues with electronic voting machines that Plaintiffs apparently believe the State must disprove. No particularized harm is identified nor can one be inferred.

### 2. The purported injuries Plaintiffs cite in their TRO are speculative, not concrete.

Not only have Plaintiffs failed to identify a particularized injury, they have also failed to plead a concrete injury, both of which must exist to establish standing. *Spokeo*, 578 U.S. at 339. Plaintiffs seek a TRO because "various counties" in Kansas – in reality it is *one county*, Johnson County – have contracts with Konnech, Inc., an election logistics software company whose CEO was recently charged by the Los Angeles County District Attorney with embezzlement of personal identifiable information. While Plaintiffs allege that Konnech has "foreign loyalties" to the "Communist Chinese Party" ("CCP") and that the CCP is an "'enemy' to America," nowhere do they allege a concrete injury that would result if the 2022 General Election proceeded as planned. Instead, Plaintiffs simply speculate that the CCP "could use poll worker data to intimidate or influence elections in their favor to weaken America" and that this is something to be "concerned" about. Plaintiffs then hypothesize that "*if*" an election official becomes aware that the county is using software that is "insecure or that poll worker[s'] personal identifiable information is stored

or streamed through this software to a foreign country," the software platform must be removed. Once again, Plaintiffs provide do not allege (let alone provide any evidence) that any county's poll workers' personal identifiable information *is* being "stored or streamed" through a foreign country. The TRO motion is entirely based on unfounded speculation, not concrete allegations.

This case is highly similar to a recent case before the U.S. District Court in Arizona which involved nearly identical allegations and requested nearly the same relief. *See Lake v. Hobbs*, No. CV-22-00677, 2022 WL 3700756 (D. Ariz. Aug. 26, 2022). The plaintiffs there argued that Arizona's electronic voting machines "created unjustified new risks of hacking, election tampering, and electronic voting fraud." *Id*. at *2. They alleged many of the same vulnerabilities in Arizona's voting machines as Plaintiffs have raised about Kansas' machines. *Id*. And, as Plaintiffs do here, the *Lake* plaintiffs claimed that the only way to overcome the alleged security issues was for the court to implement a voting procedure that used, *inter alia*, paper ballots, which were hand-counted in full view of multiple recording and streaming devices. *Id*. at **3-4.[1]

The *Lake* court found that the plaintiffs were unable to establish an injury in fact based on the sheer speculation of their allegations,. The court noted the long chain of hypothetical contingencies that would have to transpire for any harm to occur, including:

> (1) The specific voting equipment used in Arizona must have "security failures" that allow a malicious actor to manipulate vote totals; (2) such an actor must actually manipulate an election (3) Arizona's specific procedural safeguards must fail to detect the manipulation; and (4) the manipulation must change the outcome of the election.

*Id*. at *9. The court further found that "even if the allegations in Plaintiff's [sic] complaint were plausible, their alleged injury is not 'certainly impending' as required by *Clapper*." *Id*. (citing *Clapper*, 568 U.S. at 409.

---

[1] Interestingly, Plaintiffs cite testimony from the *Lake* case to support their allegation that voting machines can be hacked. Pet. ¶ 137.

Other courts faced with similar "suspicions" about voting processes have likewise found no concrete injury based on naked assertions. *See, e.g., Texas Voters Alliance v. Dallas Cnty.*, 495 F. Supp.3d 441, 452-53 (E.D. Tex. 2020) (finding no injury in fact based on plaintiffs' beliefs that defendants' grants impermissibly influenced the election as they were based on nothing more than "naked assertions"); *Samuel v. Virgin Islands Joint Bd. of Elections*, Civ. No. 2012-0094, 2013 WL 842946, at *5 (D.V.I. Mar. 7, 2013) (dismissing plaintiffs' 42 U.S.C. § 1983 claims for lack of injury-in-fact, finding that "[a]lthough Plaintiffs 'believe' Defendants have infringed on 'voters' fundamental right to vote, fair and transparent elections and to equal protection,' . . . these are conclusory allegations without factual support"); *Schulz v. Kellner*, Case No. 1:07–CV–0943, 2011 WL 2669456, at *7 (N.D.N.Y. July 7, 2011) (finding no concrete or particularized injury where plaintiffs' allegations of machine error and human fraud resulting from defendants' voting procedures amounted to nothing more than "generalized grievances").

The bottom line is that Plaintiffs' unsubstantiated fears that the CCP *might* access poll-worker data based on the CEO of a Michigan-based logistics software company allegedly misusing poll-worker data is not the kind of concrete injury that permits standing to seek a TRO to upend a Kansas election.

### 3.   Plaintiffs cannot assert standing on behalf of unnamed poll-workers.

Even if Plaintiffs could establish a concrete injury, the Court must still deny relief because, to the extent *anyone* is identified in the TRO motion, it is third-party unnamed poll-workers whom Plaintiffs speculate could have personally identifiable information exposed.  Plaintiffs' Petition, in fact, confirms that their case generally is attempting to protect the rights of others, not themselves. Pet. ¶ 6(c)(2) ("This harm is shared by *all Kansas voters* who vote on uncertified election equipment.") (emphasis added).

Plaintiffs may not seek a TRO on behalf of unnamed, third-party poll workers.  "[A] party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'"  *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quoting *Warth v. Seldin*, 42 U.S. 490, 499 (1975)).  Thus, even if Plaintiffs' claims were valid, which they are not, Plaintiffs do not claim that they are poll workers in a county where their personally identifiable information may be compromised by the CPP.  As such, they lack standing to bring seek this TRO.

### 4.  The relief Plaintiffs seek does not redress the claimed injury.

Finally, even if Plaintiffs were able to overcome the previous hurdles to standing and jurisdiction, they would still lack standing because their claimed relief does not redress their claimed injury.  The only asserted injury in their TRO motion relates to poll-worker data.  But the relief they request – banning voting machines and drop-boxes – has nothing to do with any contract with Konnech, the company they claim might be beholden to the CCP.  Plaintiffs provide no explanation as to how poll workers' personally identifiable information is related to electronic voting machines and drop boxes.  Thus, even if Plaintiffs could meet the other elements of standing, their proposed remedy would not redress the only allegations raised in the TRO motion.

### 5.  Kansas counties own the voting machines and collect ballots and thus Plaintiffs' claims are not redressable by the Defendants.

Plaintiffs' quest for standing suffers from still another infirmity:  they have sued the wrong parties.  Although Plaintiffs are correct that the Secretary of State *certifies* voting machines, the Secretary does not own or possess voting machines.  Voting machines are owned and maintained by individual counties.  *See* K.S.A. 25-4407, 4408.  Although this Court would ultimately lack the authority under the Eleventh Amendment from prohibiting the use of voting machines, as the mode

of voting is a matter of state law, *see* Kan. Const. Art. 4, § 1, the proper party to such a suit is not the Defendants, but the counties.

Likewise, Defendants do not own or possess drop boxes.  They are owned by the counties and the counties – and the counties alone – determine whether to use them.  *See* K.S.A. 25-1124(a) ("the ballot envelope shall be mailed or otherwise transmitted to the county election officer").  Any injunction issued against any of the named Defendants with respect to the use of voting machines or drop boxes, therefore, would be ineffectual.

### C.   – Plaintiffs' claims are barred by the Eleventh Amendment.

In addition to their lack of standing, Plaintiffs' claims are also foreclosed by the Eleventh Amendment.  "The Eleventh Amendment renders a state 'immune from suits brought in federal courts by her own citizens as well as by citizens of another State.'"  *Higganbotham v. Okla. ex rel. Okla. Transp. Comm'n*, 328 F.3d 638, 644 (10th Cir. 2003) (quoting *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974)).  "'[S]tates may not be sued in federal court unless they consent to it in unequivocal terms or unless Congress, pursuant to a valid exercise of power, unequivocally expresses its intent to abrogate the immunity."  *Collins v. Daniels*, 916 F.3d 1302, 1315 (10th Cir. 2019). This state sovereign immunity also precludes suits against state officials in their official capacities.  *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 400 (5th Cir. 2020).

It is true the Supreme Court recognized a narrow exception to this general rule in *Ex parte Young*, 209 U.S. 123, 164–65 (1908), which allows "suits for prospective . . . relief against state officials acting in violation of *federal* law."  *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (emphasis added).  But *Ex Parte Young* does not apply here.  Despite Plaintiffs' citations to certain federal laws and the Constitution, ultimately what they are seeking is for the Court to direct that Kansas use (or, in this case, not use) a specific method of voting, namely, electronic

voting machines and drop-boxes.  That is not a matter to which federal law speaks.  Indeed, federal courts across the country have consistently held that there is no constitutional right to a particular voting method.  *See Lake*, 2022 WL 370756, at *10; *Weber v. Shelley*, 347 F.3d 1101, 1107 (9th Cir. 2003) (holding that "[n]othing in the Constitution" prohibited the use of touchscreen voting machines as an alternative to paper ballots, and noting that it is "the job of democratically-elected representatives to weigh the pros and cons of various balloting systems."); *Pettengill v. Putnam Cnty. R-1 Sch. Dist.*, 472 F.2d 121, 122 (8th Cir. 1973) ("[The] complaint asks the federal court to oversee the administrative details of a local election. We find no constitutional basis for doing so."); *Green Party of N.Y. v. Weiner*, 216 F. Supp. 2d 176, 190-91 (S.D.N.Y. 2002) (finding that the use of voting machines is "for the elected representatives of the people to decide[.] There is no constitutional right to any particular method of registering and counting votes.").

The foundation for Plaintiffs' legal effort to block the use of electronic voting machines and drop boxes is the alleged violations by the Secretary of State of *Kansas state law*, not federal law.  As such, the Eleventh Amendment bars this suit.  *See Johns v. Stewart*, 57 F.3d 1544, 1553 (10th Cir. 1995) "[T]he Eleventh Amendment bars suits brought in federal court seeking to enjoin a state official from violating state law.").

With respect to electronic voting machines, Plaintiffs contend that Kansas' machines have not been properly certified by the Secretary of State and thus should be prohibited.  Pet. ¶¶ 95, 140.  Although Plaintiffs' claim ultimately fails, *see infra*, the basis for Plaintiffs' claim is that the Secretary violated his duties under K.S.A. 25-4404 and 25-4406 (*state laws*) by certifying voting machines that did not meet voluntary guidelines issued by the Election Assistance Commission ("EAC").  Pet. at ¶¶ 47-52, 85-98, 112.

Kansas law requires the Secretary to certify voting systems prior to their use in elections. K.S.A. 25-4404.  Kansas law specifies the requirements voting machines must meet before the Secretary can certify them.  K.S.A. 25-4406.  Relying on K.S.A. 25-4406(m), Plaintiffs theorize that the statutory language requiring voting systems to "meet the requirements of [HAVA] and other federal statutes and regulations governing voting equipment" means that voting machines must meet *voluntary guidelines* published by the EAC.  Pet. ¶ 112.  In other words, the basis for Plaintiffs' TRO motion is that the Secretary failed to perform the certification requirements of K.S.A. 25-4406(m) adequately.  Because this is an alleged violation of *state law*, the Eleventh Amendment negates Plaintiffs' right to any relief in this Court.

To be sure, Plaintiffs do claim that "HAVA creates new mandatory minimum standards for states to follow." But Plaintiffs conflate HAVA's *minimum standards* with the EAC's *voluntary guidelines*.  The *HAVA* standards are found at 52 U.S.C. § 21801.  Kansas law, specifically K.S.A. 25-4406(m), requires the Secretary of State to ensure the State's voting systems meet those requirements, which they do.  Plaintiffs' Petition, however, focuses on irrelevant EAC voluntary guidelines, which Plaintiffs refer to as "testing standards."  Pet. ¶ 86.  As the name of the guidelines indicate, these guidelines are *voluntary* and, to the extent they have any applicability in the election context, it is to laboratory testing certifications issued by the *EAC*.  *See* 52 U.S.C. § 20971(a)(1); Pet. ¶ 68.  HAVA, in fact, explicitly provides that States are *not* required to use federally certified laboratories for voting system certifications either.  52 U.S.C. § 20971(a)(2).  Just as Kansas law does not require voting systems to be compliant with EAC guidelines, K.S.A. 25-4406 does *not* require laboratory testing.  Thus, because Plaintiffs' electronic voting machine certification theory is based on alleged violations of state law, the Eleventh Amendment bars the claim.

With respect to drop boxes, Plaintiffs argue that *Kansas law* does not permit the use of drop boxes. Pet. ¶¶ 149-154 (citing K.S.A. 25-1122 and 25-1124). While Plaintiffs are not likely to succeed on the merits as to this claim either, the Eleventh Amendment bars this Court form hearing the claim because Defendants are immune to suit in federal court from claims that they are violating state law. *Gorenc v. Klaassen*, 421 F. Supp.3d 1131, 1147 (D. Kan. Sept. 2019).

**D.   HAVA provides no private right of action.**

To the extent Plaintiffs are raising issues of federal law under HAVA, rather than alleging violations of state law, Plaintiffs' motion for a TRO still must be denied because HAVA does not provide a cause of action to enforce the cited provisions. For purposes of the relevant HAVA provisions involved in their TRO Motion, Plaintiffs' Petition cites 52 U.S.C. §§ 21081(5) (HAVA Sec. 301), 20922 (HAVA Sec. 202), and 20971 (HAVA Sec. 231). Pet. ¶¶ 67-68, 94, 130, 143. None of these provisions have a private right of action.

Congress enacted HAVA in the wake of the 2000 presidential election. "HAVA serves to improve access to and the administration of federal elections." *Texas Voters Alliance*, 495 F. Supp. 3d at 458. In *Brunner v. Ohio Republican Party*, 555 U.S. 5 (2008) (per curiam), the Supreme Court summarily vacated a TRO because the parties who obtained it were "not sufficiently likely to prevail on the question whether Congress has authorized the District Court to enforce § 303 [of HAVA] in an action brought by a private litigant." *Id*. at 5. The Court supported its conclusion by citing *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002), and *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001), two cases in which it had previously emphasized that Congress must create private rights of action. *Id*. For HAVA, Congress explicitly granted enforcement powers to the Attorney General and the states. 52 U.S.C. §§ 21111-21112. It did *not* specify that private parties have the right to enforce HAVA

Federal courts faced with similar attempts to assert claims based on alleged HAVA violations have likewise found no private right of action. *See, e.g., American Civil Rights Union v. Philadelphia City Com'rs*, 872 F.3d 175, 184-85 (3rd Cir. 2017) ("HAVA dos not include a private of enforcement. . . [it] only allows enforcement via attorney general suits or administrative complaint."); *Iowa Voter Alliance v. Black Hawk County*, No. C20-2078, 2020 WL 6151559, at *2  (N.D. Iowa Oct. 20, 2020) (Congress did not create a HAVA private right of action); *Minn. Voters Alliance v. City of Minneapolis*, Civ. No. 20-2049, 2020 WL 6119937, at *6 (D. Minn. Oct. 16, 2020) ("Because HAVA does not provide Plaintiffs a private right of action, they lack standing to assert a claim under HAVA."); Taylor v. Onorato, 428 F. Supp.2d 384, 387 (W.D. Pa. 2006) (HAVA does not provide a private right of action to enforce HAVA § 301 [52 U.S.C. § 21081], nor does it create a federal right enforceable against state officials under 42 U.S.C. § 1983); *Samuel*, 2013 WL 842946, at *6 (finding no private right of action, either directly or via 42 U.S.C. § 1983, for plaintiffs' alleged HAVA claims). [2]

Under *Gonzaga*, the Supreme Court explained that in order to determine whether a statute created a private right of action requires first determining "whether Congress *intended to create a federal right*." *Gonzaga Univ.*, 536 U.S. at 283 (emphasis in original).  "[W]here a 'statute by its terms grants no private rights to any identifiable class,'" the Supreme Court has found that no private right of action was conferred.  *See id.* at 283-84 (quoting *Touche Ross & Co. v. Redington*, 442 U.S. 560, 576 (1979)).  To confer a private right of action, the statute's "text must be 'phrased in terms of the persons benefited.'"  *Id.* at 284 (quoting *Cannon v. Univ. of Chicago,* 441 U.S. 677,

---

[2] Even if Plaintiffs could bring a HAVA claim either individually or on behalf of others, HAVA's provision concerning EAC-certified voting machines is "permissive, not mandatory." *Samuel*, 2013 WL 842946, at *7 ("HAVA does not require Defendants to use EAC-certified voting machines and thus there would be nothing to enforce."); *see also* 52 U.S.C. § 20971(a)(2) ("At the option of a State, the State may provide for the testing, certification, decertification, or recertification of its voting system hardware and software by the laboratories accredited by the Commission under this section.").

692, n.13 (1979)).  Such statutes should have "an *unmistakable focus* on the benefited class."  *See id.* (*quoting Cannon*, 441 U.S. at 692, n.13) (emphasis in original).  Furthermore, even if a statute does have rights-creating terms, that is not enough.  A plaintiff must show not only that Congress intended to create "a private *right* but also a private *remedy*."  *Id.* (quoting *Alexander*, 532 U.S. 275 at 286) (emphasis in original).

The relevant HAVA provisions cited by Plaintiffs do not contain rights-creating language to any class of persons.  HAVA Section 301 sets "voting systems standards" for the States to follow.  52 U.S.C. § 21081.  The provision which Plaintiffs cite merely specifies an error rate for ballot tabulators.  *Id.* § 21081(a)(5).  HAVA Section 202 provides the duties of the EAC, including the drafting of voluntary guidelines.  52 U.S.C. § 20922.  And HAVA Section 231 merely requires the EAC to provide for testing and certification of voting equipment and to certify laboratories for the same.  52 U.S.C. § 20971(a), (b).  None of these provisions contains rights-creating language that would permit Plaintiffs to maintain a cause of action.  And even if they did, the fact that HAVA provides for its own enforcement mechanisms counsels against a finding that Congress intended to create a private right of action to enforce the provisions cited by Plaintiffs.  *See* 52 U.S.C. §§ 21111-21112.

### E.  – Plaintiffs cannot meet the standards for a Temporary Restraining Order.

#### 1.  Plaintiffs are not substantially likely to succeed on the merits.

Turning to the merits, Plaintiffs are not substantially likely to succeed on their claims.  The TRO request is limited to asking the Court to prohibit the use of electronic voting machines and drop boxes during the 2022 General Election.  But Plaintiffs' legal theories are grounded in a fundamental misreading of Kansas law.

a.  _Electronic voting machines._

Plaintiffs identify three reasons why they believe existing voting machines in Kansas cannot be used.  First, they claim that Kansas law requires the Secretary of State to only certify voting systems that meet the EAC's "Voluntary Voting Systems Guidelines" ("VVSG") Version 1.1.  Pet. ¶¶ 95, 112.  Second, they argue that the error rate of existing voting machines, as evidenced by a recount of a recent constitutional amendment, is too high. Pet. ¶¶ 100-108.  Finally, they claim that some purchased voting machines have not been certified pursuant to VVSG 1.1.  Plaintiffs are wrong as a matter of law on all of their theories.

With respect to the VVSG 1.1 theory, HAVA directed the EAC to adopt "voluntary voting system guidelines," which it has done on multiple occasions.  _See_ 52 U.S.C. § 20922(1).  However, Plaintiffs wrongly believe that Kansas law obligates the Secretary to certify voting machines in accordance with the EAC's _voluntary_ guidelines.  Pet. ¶ 95.  The VVSG is not a mandatory "testing standard" that states are required to follow.  They are _voluntary_ guidelines that states may use, if they choose, for ensuring that voting machines meet certain criteria.  Congress likewise did not evidence an intent that states be required to follow these guidelines given that Congress's directive to the EAC was to establish only "voluntary" guidelines.  _See_ 52 U.S.C. § 20922(1).  The EAC acknowledges that "[t]hese Guidelines are voluntary in that each of the states can decide whether to require the voting systems used in their state to have a national certification.  States may decide to adopt these Guidelines in whole or in part at any time, irrespective of the effective date."[3]  In

---

[3] EAC, _Voluntary Voting Systems Guidelines, Version 1.0_ at 15 (2015) _available at_ https://www.eac.gov/sites/default/files/eac_assets/1/28/VVSG.1.0_Volume_1.PDF.

fact, the EAC expressly acknowledges that "[a]dherence to the Guidelines is governed by state and territory-specific laws and procedures."[4]

Plaintiffs do not dispute that the EAC guidelines are voluntary, Pet. ¶ 95(b), but they argue that "Kansas [is] required by law to follow EAC guidelines."  Pet. ¶ 95 (citing K.S.A. 25-4406(m)). Plaintiffs misunderstand that statute.  Kansas law requires that electronic and electromechanical voting systems meet certain standards, including "the requirements of [HAVA] and other federal statutes and regulations governing voting equipment," before they can be certified by the Secretary of State.  K.S.A. 25-4406(m).  Missing from that provision is any requirement that voting systems must be certified according to the EAC's *voluntary system guidelines*.  The voluntary guidelines are not "requirements" for voting machines under HAVA.  Those HAVA requirements are found in 52 U.S.C. § 21081, and Kansas voting systems clearly meet those requirements.  As the EAC itself acknowledges, "[t]his VVSG effective date provision has no effect on the mandatory voting system requirements prescribed in HAVA Section 301(a), which states must comply with[.]"[5] Likewise, the EAC Guidelines are not "other federal statutes and regulations."  K.S.A. 25-4406(m).  The VVSGs are voluntary guidelines issued by the EAC.  Nothing more and nothing less.  Plaintiffs simply misread the Kansas statute.

With respect to the error rates, Plaintiffs argue that the recent Value Them Both amendment revealed an error rate higher than that permitted by HAVA.  Pet. ¶ 143.  They also claim that a

---

[4]  EAC, *Voluntary Voting System Guidelines, Version 2.0* at 9 (Feb. 10, 2021) *available at* https://www.eac.gov/sites/default/files/TestingCertification/Voluntary_Voting_System_Guidelines_Version_2_0.pdf.

[5]  Election Assistance Commission, *Voluntary Voting Systems Guidelines, Version 1.0* at 15 (2015) *available at* https://www.eac.gov/sites/default/files/eac_assets/1/28/VVSG.1.0_Volume_1.PDF. *See also* Election Assistance Commission, *Voluntary Voting System Guidelines, Version 2.0* at 11 (Feb. 10, 2021) *available at* https://www.eac.gov/sites/default/files/TestingCertification/Voluntary_Voting_System_Guidelines_Version_2_0.pdf ("The VVSG 2.0 definition of a voting system does not expand the HAVA definition but focuses it on election processes.")

Cherokee County post-election audit, which involved a thumb-drive programming error in one county commissioner race, likewise constitutes evidence of an unacceptable error rate. *See* Pet. at ¶ 143. But Plaintiffs again misconstrue the law. The HAVA error rate provision explicitly states that the error rate is "determined by taking into account only those errors which are attributable to the voting system and not attributable to an act of the voter[.]" 52 U.S.C. § 21081(a)(5). In other words, for a system to have an unacceptable error rate, Plaintiffs would need to provide evidence that the discrepancy was the result of *tabulators* not meeting the minimum standards, as opposed to voter error (e.g., incorrect markings on the ballots). Plaintiffs do not and cannot do so. Instead, Plaintiffs simply review the number of ballot discrepancies identified in the Value Them Both recount and, using basic math, conclude that because the recount identified minor discrepancies in the vote totals, this must prove that the error rate is too high. Pet. ¶¶ 100-107. The problem with Plaintiffs' theory is that it does not identify whether the minor vote total discrepancies were due to *voting system errors* as opposed to the *voters' errors*.

Furthermore, even if Plaintiffs had evidence that the tabulators fell below the error rate standards, which they do not, they still would not be entitled to the relief they seek for two reasons. First, all tabulators are tested *publicly* prior to each election. *See* K.S.A. 25-4411, 25-4610. To Defendants' knowledge, all tabulators tested prior to the 2022 primary were compliant. Pursuant to K.S.A. 25-4411 and 25-4610, the tabulators will be tested again prior to the upcoming General Election. Plaintiffs may attend the public testing. If, at that time, the tabulators do not meet the error rate, the county election officials can address the issue. But this is not the appropriate forum for raising issues relating to alleged tabulator error rates, particularly with the totally non-existent evidence Plaintiffs present.

In addition, the relief Plaintiffs seek in thier TRO motion has nothing to do with tabulator error rates.  Plaintiffs request the Court to ban the use of *voting machines* and *drop-boxes*.  But the alleged error rate issues they reference involve *tabulators*.  Pet. at ¶ 100 (quoting 52 U.S.C. § 21081(a)(5)).  Tabulators count voted ballots and are separate, standalone machines from the voting machines on which voters cast their votes.  *See* K.S.A. 25-4401, 25-4411, 25-4602.  Thus, even if the *tabulators* had the error rate issues about which Plaintiffs theorize, which they do not, that would not be a valid basis for banning *voting machines and drop-boxes*.

Finally, with respect to the purchasing of new voting systems, Plaintiffs claim that Johnson County ("and some others") illegally purchased systems that were not "fully certified according to HAVA to the current VVSG 1.1 standard."  Pet. ¶ 146.  This is merely a re-brand of Plaintiffs' prior misunderstanding that the EAC *voluntary* guidelines are not *mandatory* requirements for Kansas certification.  Pet. ¶ 144.  Plaintiffs are not disputing that the voting machines have been certified by the Secretary of State.  *See id.*  Instead, they are claiming that the machines could not be lawfully certified by the Secretary because they did not meet the VVSG 1.1 standard.  Again, Plaintiffs' theory fails by misreading K.S.A. 25-4406(m).

                *b.*   <u>Drop boxes.</u>

With respect to ballot drop boxes, Plaintiffs assert that advance ballots may only be mailed or physically handed to the county election officer and may not be given to county election officers via a drop box.  Pet. at ¶ 153.  Plaintiffs' argument is primarily based on a recent Wisconsin Supreme Court decision which held that *Wisconsin law* did not permit drop boxes for mail ballots. *Teigen v. Wis. Elections Comm'n*, 976 N.W.2d 519 (Wis. 2022).  The Wisconsin Supreme Court focused on both its Legislature's general policy as to absentee voting, *see id.* at 538-39, and on the specific language of the absentee ballot statute which required absentee ballots "shall be mailed

by the elector, or delivered in person, to the municipal clerk issuing the ballot or ballots." *Id.* at 539 (quoting Wis. Stat. § 6.87(4)(b)(1)). The court held that returning ballots to an unattended drop box did not constitute "delivery 'to the municipal clerk.'" *Id.* The Court also focused on another statute, which involved "alternate sites" for casting ballots and which were to be "staffed by the municipal clerk" or others, as evidence that Wisconsin law did not permit voters to return ballots to an unattended drop box. *See id.* at 647-48.

Obviously, Kansas is not bound by Wisconsin law. Kansas permits an advance ballot to "be mailed *or otherwise transmitted* to the county election officer." K.S.A. 25-1128 (emphasis added). That phrasing is different from the Wisconsin statute, which provided that a ballot must be "delivered in person, to the municipal clerk." *Teigen*, 976 N.W. at 646. Kansas law, specifically K.S.A. 25-1124(a), permits clerks to provide for ballot drop boxes as a means of "otherwise transmitt[ing]" ballots to the clerks.

### 2. *Plaintiffs have not sufficiently identified the irreparable harm they will suffer.*

Although Plaintiffs claim that they will suffer irreparable harm if the 2022 General Election is permitted to proceed with the use of drop boxes and electronic voting machines, they do not explain what the harm is. By failing to describe the irreparable harm, Plaintiffs have not met their burden of establishing the requirements of a TRO. And even if one could glean an irreparable harm from Plaintiffs' concerns about voting security, those claims are entirely speculative. "Purely speculative harm will not suffice" to establish irreparable harm. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009)

Finally, even if Plaintiffs had provided anything beyond a speculative harm, their decision to wait until the eve of the election to file suit, and then wait almost another month to seek a TRO, contradicts their claimed irreparable harm. "[D]elay in seeking preliminary relief cuts against [a]

finding [of] irreparable injury." *RoDa Drilling Co.*, 552 F.3d at 1212 (citation omitted).  The delay by Plaintiffs in seeking this injunction is not small.  Plaintiffs' complaints about voting machines involve certifications that have been taking place for nearly five years.  *See* Pet. ¶ 95 (claiming that voting machines certified after July 6, 2017 should not be used).  Similarly, drop boxes have been used in many counties for decades in Kansas, and they have been used by nearly county in the State for two years.  Plaintiffs cannot wait years to bring suit and then seek a TRO on the eve of an election.  Such tactics counsel against a finding of irreparable harm.

> **3.   *The State's irreparable harm outweighs any harms to Plaintiffs and an injunction would be adverse to the public interest in orderly election administration.***

Even if the Court determines that one or more of Plaintiffs' claims not only survive the jurisdictional defenses and procedural roadblocks set forth above, but also show a likelihood of success on the merits, a preliminary injunction would still be wholly inappropriate here due to the imminence of the November 8 General Election and the adverse impact such relief would have on the State's ability to administer an orderly election.

The Supreme Court has consistently directed lower courts to exercise significant caution and restraint before ordering any changes to a state's election procedures on the eve of an election. The Court has observed that such "orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls.  As the election draws closer, that risk will increase." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (per curiam). Requests for injunctive relief that would change election law in close proximity to an election are met with extreme skepticism and nearly always rejected. *See Veasey v. Perry*, 769 F.3d 890, 894-95 (5th Cir. 2014) (cataloguing Supreme Court cases).

Justice Kavanaugh, in a recent concurrence denying an application to vacate a stay of a district court's attempt to change a state's election procedures too close to the election, nicely described the policy considerations behind courts needing to stay their hand in these late-in-the-day disputes. *See Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020):

> The Court's precedents recognize a basic tenet of election law: When an election is close at hand, the rules of the road should be clear and settled. That is because running a statewide election is a complicated endeavor. Lawmakers initially must make a host of difficult decisions about how best to structure and conduct the election. Then, thousands of state and local officials and volunteers must participate in a massive coordinated effort to implement the lawmakers' policy choices on the ground before and during the election, and again in counting the votes afterwards. And at every step, state and local officials must communicate to voters how, when, and where they may cast their ballots through in-person voting on election day, absentee voting, or early voting.
>
> Even seemingly innocuous late-in-the-day judicial alterations to state election laws can interfere with administration of an election and cause unanticipated consequences. If a court alters election laws near an election, election administrators must first understand the court's injunction, then devise plans to implement that late-breaking injunction, and then determine as necessary how best to inform voters, as well as state and local election officials and volunteers, about those last-minute changes. It is one thing for state legislatures to alter their own election rules in the late innings and to bear the responsibility for any unintended consequences. It is quite another thing for a federal district court to swoop in and alter carefully considered and democratically enacted state election rules when an election is imminent.
>
> That important principle of judicial restraint not only prevents voter confusion but also prevents election administrator confusion – and thereby protects the State's interest in running an orderly, efficient election and in giving citizens (including the losing candidates and their supporters) confidence in the fairness of the election. *See Purcell*, 549 U.S., at 4–5; *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008) (plurality opinion). The principle also discourages last-minute litigation and instead encourages litigants to bring any substantial challenges to election rules ahead of time, in the ordinary litigation process. For those reasons, among others, this Court has regularly cautioned that a federal court's last-minute interference with state election laws is ordinarily inappropriate.

Kansas has a strong interest in orderly election administration. *Doe v. Reed*, 561 U.S. 186, 198 (2010). Advance voting begins in one-week. *See* K.S.A. 25-1122. Counties have been

preparing for this election for months, including preparing to have voters cast their ballots on voting machines and preparing to accept advance ballots at certain drop box locations. A change to these voting procedures would have a significant impact on the counties. At this late date, it would be impossible for counties to organize, train, staff, and fund an election using all paper ballots (as Plaintiffs advocate) when all procedures in place are designed for an election using electronic voting machines. And even if it would be possible, HAVA requires each polling place to have "at least one direct recording electronic voting system or other voting system equipped for individuals with disabilities," 52 U.S.C. § 21081(a)(3)(B), meaning that Plaintiffs are proposing a system that would contravene federal law.

The changes that Plaintiffs propose would precipitate substantial voter confusion and frustration. *See Swamp v. Kennedy*, 950 F.2d 383, 386 (7th Cir. 1991) ("Avoiding voter confusion is also a compelling state interest."); *Const. Party of Kan. v. Biggs*, 813 F. Supp. 2d 1274, 1279 (D. Kan. 2011), *aff'd sub nom. Const. Party of Kan. v. Kobach*, 695 F.3d 1140 (10th Cir. 2012) ("The state has a legitimate interest in avoiding voter confusion, deception, or other election process frustrations without presenting empirical evidence that the contested measure in fact reduces those risks."). Kansas voters have used electronic voting machines for at least a decade. Voters would be confused and question why voting machines were suddenly prohibited by a last-minute injunction.

Kansas voters are also familiar with drop-boxes. Many counties inform voters of drop-box locations.[6] A last second TRO which alters voters' planned method of returning their ballots will confuse them when they travel to the location they intend to return their ballot, only to find that a

---

[6] https://www.jocoelection.org/voting-election-info/advance-voting (*last visited* Oct. 12, 2022); https://www.sedgwickcounty.org/elections/ballot-drop-boxes/ (last visited Oct. 12, 2022).

last minute injunction prohibits them from doing so. Had Plaintiffs wanted to challenge the use of

voting machines and drop boxes in Kansas for the 2022 election, they should not have waited until

the eve of the election to bring their lawsuit. Entering this sweeping injunction at this late date

would cause havoc on election administration and erode voter confidence. These harms are both

irreparable and adverse to the public interest. As such, Plaintiffs' TRO must be denied.

### IV.  Conclusion

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs'

Motion for an Emergency Temporary Restraining Order.

Respectfully Submitted,

By: /s/ Bradley J. Schlozman
Bradley J. Schlozman (KS Bar #17621)
Amy M. Decker (KS Bar #18739)
HINKLE LAW FIRM LLC
1617 North Waterfront Parkway, Suite 400
Wichita, KS 67206
Tel.: (316) 267-2000
Fax: (316) 630-8466
E-mail: bschlozman@hinklaw.com
E-mail: adecker@hinklaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on October 12, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notifications of such filing to the e-mail addresses on the electronic mail notice list.  I also certify that paper copies of the foregoing will be mailed to each of the pro se Plaintiffs via first class mail, postage prepaid.

By: /s/ Bradley J. Schlozman