## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**KATIE ROBERTS, et al.,**

        **Plaintiffs,**

**v.**                                  **Case No. 22-2366-DDC-ADM**

**BRIAN CASKEY, et al.,**

        **Defendants.**

## MEMORANDUM AND ORDER DENYING PLAINTIFFS' MOTION FOR A <u>TEMPORARY RESTRAINING ORDER</u>

Plaintiffs[1] have moved for a "Temporary Restraining Order (TRO)/Emergency Injunction" that would, if granted, "remove all electronic voting machines and drop boxes for the upcoming 2022 midterm elections in all Kansas precincts until a proper hearing and judge ruling can be had."  Doc. 14 at 1.  Plaintiffs' Complaint—they refer to it as a "Verified Petition"—also seeks an order "compelling [defendants] to decertify Kansas' 2020 presidential election [results] and to rerun Kansas' 2020 presidential election in accordance with Kansas law."  Doc. 1 at 19 (¶ 64).  But plaintiffs' allegations about the 2020 election are not at issue on the current motion.

The "midterm election[s]" they reference will occur on November 8, 2022—some 20 days from now.  Plaintiffs' motion asserts generally that "various counties in Kansas hav[e] contracts with election companies with foreign loyalties, such as Konnech[ ]."  Doc. 14 at 1. Plaintiffs also assert that Konnech's "Chinese CEO" recently was charged with sending "1.8

---

[1]     Plaintiffs are:  Katie Roberts, Rosemary Walker, Thad Snider, Stacie Harvey, Hannah Mingucci, and Melissa Leavitt.  They are representing themselves in this action, so the court applies the relatively forgiving standard adopted by our Circuit for such cases. *See, e.g.*, *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  But this relaxed standard doesn't excuse plaintiffs from complying with rules or the standards they adopt.  Pro se litigants must "'follow the same rules of procedure that govern other litigants.'"  *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (quoting *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994)).

million American[s']" personal identifying information to China's Communist Party. *Id*. Plaintiffs theorize that the Community Party "could use [this] poll worker data to intimidate or influence elections in their favor to weaken America." *Id*. Though they don't argue it explicitly, plaintiffs seem to assume that the personal information allegedly stolen includes information about Kansas poll workers.

Defendants, four officials[2] of the Kansas state government, have made a fulsome response to the TRO motion. *See* Doc. 18. They argue, highly summarized, that: this federal court is powerless to issue a writ of mandamus (something also sought by plaintiffs' Complaint); plaintiffs lack Article III standing to sue, meaning the court lacks jurisdiction to hear their case; the Eleventh Amendment bars plaintiffs from suing defendants in federal court; plaintiffs invoke a federal election law that provides no private right of action; and, in any event, plaintiffs haven't met the demanding standard applied to requests for a TRO.

The court conducted a hearing on the motion on October 14, 2022. Plaintiffs appeared personally and several of them argued their cause pro se. Defendants appeared by their counsel of record, Bradley J. Schlozman. Defendant Bryan Caskey was present for the hearing, as well as Clay Barker, General Counsel for the Office of the Kansas Secretary of State, and Mr. Schlozman argued the cause for all defendants.

At the end of the hearing, the court informed the parties that it was highly unlikely the court would grant plaintiffs' motion. This Order now confirms that prediction, and explains why, below.

---

[2]     The four Kansas officials are: Governor Laura Kelly, Attorney General Derek Schmidt, Secretary of State Scott Schwab, and Director of Elections Bryan Caskey.

## Analysis

### I.      TO SECURE A TRO, PLAINTIFFS MUST SHOULDER A HEAVY BURDEN.

To show that they deserve a temporary restraining order, plaintiffs must establish four things:

- they are likely to succeed on the merits of their claims;

- they are likely to sustain irreparable harm without the preliminary relief they seek;

- the balance of equities tips in their favor; and

- a TRO will serve the public interest.

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (identifying standard for preliminary injunctions); *see also Sac & Fox Nation of Mo. v. LaFaver*, 905 F. Supp. 904, 907 (D. Kan. 1995) (applying preliminary injunction standard to request for a TRO).  Because preliminary relief such as a TRO represents an extraordinary remedy, the movant's right to relief "must be clear and unequivocal."  *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) (quotation cleaned up).

Federal courts "disfavor" some forms of injunctions.  *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019).  And as it turns out, the TRO sought here qualifies for two of the three forms of disfavored injunctions, *i.e.*, the TRO would: "mandate[ ] action (rather than prohibiting it)," and "change[ ] the status quo[.]"  *Id*.

When preliminary relief would change the rules for a rapidly approaching election, controlling precedent elevates this standard yet again.  "Court orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls."  *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006).  The nearer the election, the greater the risk of

confusion.  *Id*. at 5.  Justice Kavanaugh recently emphasized the importance of judicial restraint

in this context:

> The Court's precedents recognize a basic tenet of election law:
> When an election is close at hand, the rules of the road should be
> clear and settled.  That is because running a statewide election is a
> complicated endeavor.  Lawmakers initially must make a host of
> difficult decisions about how best to structure and conduct the
> election.   Then, thousands of state and local officials and
> volunteers must participate in a massive coordinated effort to
> implement the lawmakers' policy choices on the ground before and
> during the election, and again in counting the votes afterwards.
>
> . . . .
>
> That important principle of judicial restraint not only prevents
> voter confusion but also prevents election administrator
> confusion—and thereby protects the State's interest in running an
> orderly, efficient election and in giving citizens (including the
> losing candidates and their supporters) confidence in the fairness
> of the election.   The principle also discourages last-minute
> litigation and instead encourages litigants to bring any substantial
> challenges to election rules ahead of time, in the ordinary litigation
> process.  For those reasons, among others, this Court has regularly
> cautioned that a federal court's last-minute interference with state
> election laws is ordinarily inappropriate.

*Democratic Nat'l Comm. v. Wis. State Legis.*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J.,

concurring) (denying application to vacate stay of district court's order modifying election

procedures close to election) (citations omitted).

In sum, plaintiffs' motion here, presented as it is in the "late innings" of the run up to a

general election, must shoulder a heavier load than a run-of-mine request for preliminary relief.

As Part II explains, plaintiffs fail to sustain their burden.

## II.   PLAINTIFFS HAVE FAILED TO SUSTAIN ALL FOUR PRONGS OF THE TRO STANDARD.

Plaintiffs have established none of the requirements for a TRO.  The court begins by

explaining why plaintiffs are unlikely to succeed on the merits of their claims.  The court then

turns to plaintiffs' theory of irreparable harm.  And last, combining the third and fourth factors of

the TRO standard, the court concludes that neither the equities nor the public interest favor a

TRO.

**A.  Plaintiffs haven't established that they are likely to succeed on the merits.**

To begin, plaintiffs can't succeed on the merits of their claims without first establishing

that our court has subject matter jurisdiction to hear their claims.  And plaintiffs can't establish

subject matter jurisdiction unless they have Article III standing to sue.  *Peck v. McCann*, 43 F.4th

1116, 1124 (10th Cir. 2022); *see also Cole v. Goossen*, 402 F. Supp. 3d 992, 1002 (D. Kan.

2019) (before reaching question raised by preliminary injunction motion, court must evaluate

standing).

The Tenth Circuit outlined the essential role of Article III standing in a 2006 en banc

decision:

> The role of federal courts in our democratic society is "properly
> limited."  *Allen v. Wright*, 468 U.S. 737, 750 (1984); *see also
> Valley Forge Christian Coll. v. Ams. United for Separation of
> Church & State, Inc.*, 454 U.S. 464, 476 (1982).  Rather than being
> constituted as free-wheeling enforcers of the Constitution and
> laws, the federal courts were limited to what James Madison called
> "cases of a Judiciary Nature," 2 The Records of the Federal
> Convention of 1787, at 430 (Max Farrand ed., 1911), and [this is
> what] Article III of the Constitution calls "cases" and
> "controversies."  U.S. Const. art. III, § 2.  Concern for this limited
> judicial role is reflected in the principle that, for a federal court to
> exercise jurisdiction under Article III, plaintiffs must allege (and
> ultimately prove) that they have suffered an "injury in fact," that
> the injury is fairly traceable to the challenged action of the
> Defendants, and that it is redressable by a favorable decision.
> *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).
> Particularly important, for present purposes, is the requirement of
> an "injury in fact," which the Supreme Court has defined as "an
> invasion of a legally protected interest which is (a) concrete and
> particularized and (b) actual or imminent, not conjectural or
> hypothetical."  *Id*. at 560 (internal quotation marks, citations, and
> footnote omitted).

*Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006) (en banc).  This

formulation of the standing requirement conforms with the Supreme Court's more recent

standing cases, most notably, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Plaintiffs here

face substantial difficulties on all rudiments of the recipe for Article III standing.

 *First*, the court predicts that plaintiffs will struggle to plead—and later, prove—"an injury

in fact."  Establishing such an injury requires "invasion of a legally protected interest which is

(a) concrete and particularized, and (b) actual or imminent[.]" *Lujan*, 504 U.S. at 560 (quotation

cleaned up).  Conjectural or hypothetical injuries won't suffice.  *Id*.  And that's all plaintiffs have

advanced so far.

 Plaintiffs hypothesize that Konnech's CEO might convey wrongfully acquired[3] personal

identifying information to the Chinese Communist Party.  And then, they theorize, the Chinese

Communists might use this purloined "poll worker data" to "intimidate or influence elections in

their favor"—meaning, one presumes, to favor the interests of China's Communists.  Doc. 14 at

1.  But how might this series of events injure plaintiffs personally?  Plaintiffs never say.  As our

Circuit has emphasized, "[i]n a plea for injunctive relief, a plaintiff cannot maintain standing by

asserting an injury based merely on 'subjective apprehensions' that the defendant might act

---

[3] While plaintiffs haven't provided much information about this CEO, they did provide some
information.  *See* Doc. 20-1 at 1 (citing Pls.' Ex. 1).  Also, an Associated Press account reports that
Konnech's CEO—Eugene Yu—was arrested recently on charges brought by authorities in Los Angeles
County.  According to the AP's report, the CEO "was arrested [on October 6] on suspicion of stealing
data on hundreds of Los Angeles County poll workers." *See CEO of Election Software Firm Held on ID
Info Theft Charges*, Associated Press, Oct. 13, 2022, https://apnews.com/article/business-elections-los-
angeles-michigan-government-and-politics-078e0b0beb6217dca48318542eec94ee (last visited Oct. 19,
2022).  Plaintiffs have provided no information contending that Mr. Yu wrongfully accessed or
misdirected information about Kansas poll workers or other Kansas election officials.

 As the court understands plaintiffs' exhibits and other reports about this arrest, no court has
convicted Mr. Yu of a crime.  The court recognizes Mr. Yu's right to a presumption of innocence and thus
expresses no opinion whether Mr. Yu is guilty or not guilty of any charge he may face.

unlawfully." *Finstuen v. Crutcher*, 496 F.3d 1139 (10th Cir. 2007) (quoting *City of L.A. v. Lyons*, 461 U.S. 95, 107 n.8 (1983)).

At best, plaintiffs claim that the hypothesized intimidation "should be taken seriously, and every American regardless of political affiliation should be concerned about foreign entities meddling with America elections in any form." Doc. 14 at 1. But as the cases recognize, plaintiffs may not satisfy the injury in fact requirement by asserting that others may sustain an injury. *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (suing parties "generally must assert [their] own legal rights and interests, and cannot rest [their] claim to relief on the legal rights or interests or third parties" (quotation cleaned up)). Plaintiffs cannot invoke the court's jurisdiction to protect others—poll workers. And to the extent plaintiffs claim they will sustain an injury because of their interest in free and fair elections safe from foreign meddling, that interest is not "concrete and particularized," and "actual or imminent[.]" *Lujan*, 504 U.S. at 560 (quotation cleaned up). It is, instead, "conjectural or hypothetical." *Id*. (quotation cleaned up). "Particularized" injuries are ones that affect plaintiffs in a "personal and individual way." *Spokeo*, 578 U.S. at 339 (quotation cleaned up). Plaintiffs bring the court no facts (or even any allegations) that they've sustained (or will sustain) such as an injury without relief.

*Second*, the court predicts plaintiffs also will struggle to prove that the putative injury "is fairly traceable to the challenged action of" these defendants. *Initiative & Referendum Inst.*, 450 F.3d at 1087. At the October 14 hearing, plaintiffs asserted that the election officer in one Kansas county—Johnson County—had a contract with Konnech. Defendants conceded that they didn't dispute this statement. The court predicts that plaintiffs will labor to show how a purported injury arising (in plaintiffs' minds) from a contract between Konnech and Johnson County's elections office is "fairly traceable" to any of this case's defendants.

Even assuming plaintiffs could satisfy the first two standing requirements, they've

brought the court no facts suggesting that their injury is redressable by a decision in their favor.

*Lujan*, 504 U.S. at 560–61.  Plaintiffs never explain how a TRO forbidding use of electronic

voting machines and drop boxes in Kansas's coming election would redress the injury that they

fathom, *i.e.*, use of poll workers' personal information to intimidate or influence those poll

workers.

In sum, plaintiffs face daunting standing challenges, and they've provided no plausible

means suggesting that they can cure them.  Without Article III standing, there's no subject matter

jurisdiction.  And without jurisdiction, the court is powerless to issue a TRO.  The court thus

concludes that plaintiffs are not likely to succeed on the merits of their claims.  This conclusion,

by itself, alone is sufficient to defeat their request for preliminary relief.  But there are other

reasons to deny their motion.

Could plaintiffs survive the standing issue, the Eleventh Amendment's grant of sovereign

immunity imposes additional doubt about their likelihood of success.  Plaintiffs have sued four

state officials in federal court.  The Eleventh Amendment proscribes use of federal judicial

power in suits against any one of the United States.  This Amendment's immunity applies

"regardless of whether a plaintiff seeks declaratory or injunctive relief, or money damages."

*Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250, 1252 (10th Cir. 2007) (citation omitted).

Also, the Amendment's immunity "extends to arms of the state and to state officials who are

sued . . . in their official capacity."  *Turner v. Nat'l Council of State Bds. of Nursing, Inc.*, 561 F.

App'x 661, 665 (10th Cir. 2014) (citing *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir.

2013)).

To be sure, the Supreme Court's decision in *Ex parte Young*, 209 U.S. 123 (1908) recognizes a limited path around the Eleventh Amendment.  This narrow path opens to federal court plaintiffs who sue state officials and allege an ongoing violation of federal law and "seek[ ] relief properly characterized as prospective."  *Turner*, 561 F. App'x at 668 (quotation cleaned up).  But to qualify for this exception, plaintiffs must claim that "state officials [are] acting in violation of *federal* law."  *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (emphasis added).  Here, the only alleged violation of *federal* law is purported violations of the Help America Vote Act ("HAVA").  *See* Doc. 1 at 21–22, 36, 55, 63–64 (¶¶ 67–68, 94, 130, 143) (citing 52 U.S.C. §§ 20922, 20971, 21081, 21085).  But, this act explicitly grants enforcement of HAVA to the Attorney General and the states—not private litigants.  *See* 52 U.S.C. §§ 21111–21112.  Based on these statutory provisions, courts have held that HAVA provides no private right of action.  *See, e.g.*, *Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (holding that TRO applicant was "not sufficiently likely to prevail on the question whether Congress has authorized the District Court to enforce [HAVA] in an action brought by a private litigant to justify the issuance of a TRO"); *Am. Civil Rights Union v. Phila. City Comm'rs*, 872 F.3d 175, 184–85 (3d Cir. 2017) ("HAVA does not include a private right of enforcement. . . . [it] only allows enforcement via attorney general suits or administrative complaint."); *Minn. Voters All. v. City of Minneapolis*, No. 20-2049 (MJD/TNL), 2020 WL 6119937, at *6 (D. Minn. Oct. 16, 2020) ("Because HAVA does not provide Plaintiffs a private right of action, they lack standing to assert a claim under HAVA.").  So, plaintiffs likely can't succeed on the merits of proving a violation of federal law by state officials—as a way to avoid Eleventh Amendment immunity under *Ex parte Young*—because the federal law they invoke, *i.e.*, HAVA, provides no private right of action.

9

Eventually, plaintiffs may manage to navigate their way around these Eleventh Amendment challenges.  Certainly, they strived to do so during the TRO hearing.  But they have not yet shown a clear path to suing these state officials in federal court.  So, to date, they haven't identified a "clear and unequivocal" route to success on the merits.  *Diné Citizens*, 839 F.3d at 1281 (quotation cleaned up).

**B.  Plaintiffs haven't established they will sustain, absent a TRO, irreparable harm.**

The Circuit's cases calibrate the kind of harm plaintiffs must identify to deserve preliminary relief.  "[P]urely speculative harm does not amount to irreparable injury[.]"  *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003).  But neither does this standard require certainty.  "[A] plaintiff who can show a significant risk of irreparable harm has demonstrated that the harm is not speculative."  *Id.*  Plaintiffs here don't satisfy this standard.

The best plaintiffs can do is asserting a conclusion:  If the court doesn't proscribe use of voting machines and drop boxes, the Chinese Communist Party "could use poll worker data to intimidate or influence elections in their favor" and thus "weaken America."  Doc. 14 at 1.  But how might that happen?  What facts provide an inference that there's a "significant risk" that this will happen?  And how would a court order banning use of voting machines and drop boxes spare these evils?  Plaintiffs provide no cogent, or even plausible answer for those questions.  Their failure, the court finds, places any putative irreparable harm at the speculative end of the spectrum—and nowhere near the "significant risk" required by our Circuit's standard.

Also—and assuming plaintiffs had made a coherent showing of harm—their delay undercuts the requirement of *irreparable* harm.  In their voting machine allegations, plaintiffs claim that Kansas failed to certify all voting machines purchased after July 6, 2017, properly.  Doc. 1 at 37 (¶ 95.a.).  This, they claim, renders "all elections since 2017 null and void."  *Id.*

Plaintiffs didn't offer (and couldn't provide, when asked) any explanation why they waited until September of 2022 to file their lawsuit challenging these purportedly wrongful mechanisms. When it comes to drop boxes, defendants represent (and plaintiffs do not dispute) that some Kansas counties have used drop boxes "for decades," and that nearly every Kansas county used them in elections two years ago.  Doc. 18 at 22 (emphasis omitted).

Tenth Circuit authority recognizes that "delay can undermine a claim of irreparable harm[.]" *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994).  Since plaintiffs articulate no plausible explanation why they waited so long to present their claim of irreparable harm, this delay undercuts plaintiffs' argument that continuing current practices until the court can resolve this case will produce irreparable harm. In sum, the court finds plaintiffs haven't sustained their burden to identify irreparable harm.

### C. The remaining two factors (balance of equities and public interest) do not favor granting preliminary relief.

The last two factors require plaintiffs to show that the balance of equities favors granting them preliminary relief and, separately, that the requested TRO will serve the public interest. *Winter*, 555 U.S. at 20.  Neither factor falls in plaintiffs' favor.  Several considerations produce this conclusion.

First, election day is November 8— 20 days from now.  Advance voting will begin even sooner, opening next week on October 24, 2022.  If voter turnout equals the turnout for August's primary election in Kansas—and historical experience suggests turnout for a general election will exceed the antecedent primary election—more than half of a million Kansans will participate in a right the Supreme Court views as "of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quotation cleaned up).  For a federal court to insert itself into that process so close to the election would upend

11

complex planning needed to administer an election according to laws adopted by Kansas's

elected representatives.  As Justice Kavanaugh emphasized, "a federal court's last-minute

interference with state election laws is ordinarily inappropriate."  *Democratic Nat'l Comm.*, 141

S. Ct. at 31 (Kavanaugh, J., concurring).

But this is no ordinary motion for preliminary relief.  It is extraordinary in the scope of

relief sought and in the threshold legal problems plaintiffs face.  Plaintiffs' TRO motion is long

on suspicion, contingency, and hypothesis, but short on facts and identifiable harm.  The court

finds that granting the TRO would not serve the public interest, and the equities do not tip in

plaintiffs' favor.

## Conclusion

Kansas's popularly elected leaders have chosen processes and methods to use in the

state's elections.  It may not represent the system that plaintiffs prefer, and our Constitution

entitles them to express their opinions.  But nothing in the current record entitles them to

sweeping use of federal judicial power to impose their views on their state or their fellow

Kansans.

The court thus denies plaintiffs' Motion for Court to Grant Emergency TRO (Doc. 14)

for reasons expressed in this Order.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' "Motion for

Court to Grant Emergency TRO" (Doc. 14) is denied.

**IT IS SO ORDERED.**

**Dated this 19th day of October, 2022, at Kansas City, Kansas.**

> **s/ Daniel D. Crabtree**
> **Daniel D. Crabtree**
> **United States District Judge**